UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal No. 22 cr 71 |
| v. | |
| GLENCORE LTD. | VIOLATION:<br>18 U.S.C. § 371 (Conspiracy) |

**United States District Court
District of Connecticut
FILED AT   HARTFORD
5/24                  20 22
Dinah Milton Kinney, Clerk
By_____
Deputy Clerk**

INFORMATION

The United States of America charges:

COUNT ONE
(Conspiracy to Commit Commodity Price Manipulation)

Relevant Entities

1.  At all times relevant to this Information, GLENCORE LTD. ("GLENCORE") operated a global commodities trading business that included trading in fuel oil and related products. GLENCORE was a branch of Glencore AG, which was a subsidiary of Glencore International AG and whose ultimate parent company was Glencore plc. Until mid-2017, GLENCORE was based in Stamford, Connecticut.[1] Thereafter, it was based in New York, New York.

2.  Chemoil Corporation ("Chemoil"), together with its subsidiaries and affiliates, was an oil trading company that was headquartered in Singapore and had offices in, among other places, San Francisco, California. Chemoil operated a global commodities trading business that included the trading in fuel oil and related products. At all times relevant to this Information prior to April 2014, Glencore plc indirectly held a majority ownership stake in Chemoil. More specifically, in January 2010, Glencore plc indirectly acquired a 50.81% stake in Chemoil, with

---

[1] All dates and numbers in this Information are approximate.

Glencore plc raising its stake in Chemoil to 89% in February 2012, and then fully acquiring indirect ownership of Chemoil in April 2014.

### S&P Global Platts Benchmark Price Assessments

3. S&P Global Platts ("Platts") was a leading independent provider of information, benchmark prices, and analytics for energy and other commodities markets. Among other things, Platts published daily price assessments for various fuel oil markets throughout the United States and internationally, including for intermediate fuel oil 380 CST at the Port of Los Angeles ("L.A. Bunker Fuel") and RMG 380 fuel oil at the Port of Houston ("USGC HSFO"). The Port of Los Angeles was the busiest shipping port in the United States by container volume. The Port of Houston was the largest U.S. port on the Gulf Coast and the busiest port in the United States by foreign waterborne tonnage.

4. Platts daily price assessments were meant to reflect the prevailing market price at a point in time for the specific product that was the subject of the assessment (*e.g.*, L.A. Bunker Fuel, USGC HSFO), and Platts price assessments were used by market participants to calculate pricing formulas in certain contracts. In formulating the daily price assessments for a given product, Platts used, among other things, a Market-on-Close ("MOC") process in which Platts reviewed orders to buy and sell ("bids" and "offers," respectively) submitted by market participants to Platts during designated daily 30- to 45-minute periods (the "Platts Window"). Platts also solicited information regarding current market conditions from market participants, which informed, among other things, where Platts set the initial starting price for trading in the Platts Window (*i.e.*, the "peg") as well as the price assessment published after the close of the Platts Window.

### The Conspiracy to Manipulate Commodity Prices

5.  From January 2011 and continuing through August 2019, in the District of Connecticut and elsewhere, the defendant, GLENCORE knowingly and willfully did combine, conspire, confederate, and agree with others, including Emilio Jose Heredia Collado ("Heredia"), to manipulate the price of a commodity in interstate commerce, namely, fuel oil, in violation of Title 7, United States Code, Section 13(a)(2).

### The Purpose of the Conspiracy

6.  The purpose of the conspiracy was for GLENCORE and its co-conspirators to unlawfully enrich themselves by increasing profits and reducing costs on contracts for physical fuel oil contracts, and/or increasing profits and reducing losses on derivative positions relating to fuel oil, held by GLENCORE, where the price terms and/or value of those contracts and/or positions were set by reference to the daily benchmark price assessments published by Platts, specifically, the Platts assessments for L.A. Bunker Fuel or USGC HSFO.

### Manner and Means of the Conspiracy

7.  The manner and means by which GLENCORE and its co-conspirators sought to accomplish and did accomplish the purpose of the conspiracy included the following:

*L.A. Bunker Fuel*

   a.  On numerous occasions from September 2012 through August 2016, at Heredia's direction, employees of Chemoil and later of GLENCORE, including Marketer-1, Marketer-2, and Marketer-3, submitted bids and offers to Platts during the Platts Window for L.A. Bunker Fuel with the intent to cause an artificial price, that is with the intent to push the L.A. Bunker Fuel price assessment up or down artificially so that the L.A. Bunker Fuel price assessment did not reflect legitimate market-based forces of supply and demand, and in order to unlawfully enrich themselves, Chemoil, and later GLENCORE

by increasing profits and reducing costs on Chemoil's and GLENCORE's contracts for physical fuel oil, including contracts with Trading Firm A[2] to buy and sell fuel oil, where the price terms of those contracts were set by reference to the L.A. Bunker Fuel benchmark price assessment.

        i.        More specifically, if GLENCORE (or previously, Chemoil) had a contract to sell fuel oil to Trading Firm A that was priced by reference to the L.A. Bunker Fuel price assessment, it was in GLENCORE's (and previously, Chemoil's) interest for the L.A. Bunker Fuel price assessment to be as high as possible. Heredia directed his co-conspirators, including Marketer-1, Marketer-2, and Marketer-3, to submit bids to Platts and subsequently raise the price of those bids during the Platts Window for the express purpose of pushing up the L.A. Bunker Fuel price assessment artificially and in a manner that did not reflect legitimate market-based forces of supply and demand.

        ii.        Conversely, if GLENCORE (or previously, Chemoil) had a contract to buy fuel oil from Trading Firm A that was priced by reference to the L.A. Bunker Fuel price assessment, it was in GLENCORE's (and previously, Chemoil's) interest for the L.A. Bunker Fuel price assessment to be as low as possible. Heredia directed his co-conspirators, including Marketer-1, Marketer-2, and Marketer-3, to submit offers to Platts and subsequently lower the price of those offers during the Platts Window for the express purpose of pushing down the L.A. Bunker Fuel price assessment artificially and in a manner that did not reflect legitimate market-based forces of supply and demand.

---

[2] At all times relevant to this Information, Trading Firm A operated as the trading arm of National Oil Company A, a foreign state-owned petroleum company.

b.      GLENCORE and Chemoil, through its salespeople, including Marketer-1, Marketer-2, and Marketer-3, acting at Heredia's direction, submitted these bids and offers for L.A. Bunker Fuel to Platts during the Platts Window for the purpose of artificially affecting the L.A. Bunker Fuel price assessment and hence artificially decreasing or increasing the price of fuel oil bought from or sold to Trading Firm A, and not for any legitimate economic reason.

c.      In total, Chemoil and GLENCORE unlawfully gained over $85 million from manipulating the L.A. Bunker Fuel price assessment.

*"Joint Venture" with Trading Firm A*

d.      From January 2014 through February 2016, Heredia, on behalf of Chemoil and later GLENCORE, entered into an informal joint venture with Trading Firm A to help Trading Firm A blend, ship, and ultimately sell fuel oil (a commodity in interstate and international commerce) in Singapore (the "Joint Venture"). As part of the Joint Venture, Trading Firm A purchased fuel oil from National Oil Company A, with the pricing terms set by reference to the L.A. Bunker Fuel price assessment. Trading Firm A then transported the fuel oil to the Port of Los Angeles, where Chemoil and later GLENCORE assisted with blending the fuel oil to meet certain quality standards and specifications, and the fuel oil then was shipped to Singapore, where it was sold.

e.      During the Platts Window on certain days when Trading Firm A was buying fuel oil from National Oil Company A, salespeople at Chemoil and later GLENCORE, including Marketer-1, acting at Heredia's direction, submitted one or more offers to Platts and subsequently lowered the price of those offers during the Platts Window for L.A. Bunker Fuel with the intent to push down the L.A. Bunker Fuel price assessment, and hence

the price of fuel oil that Trading Firm A bought from National Oil Company A in connection with the Joint Venture, artificially and in a manner that did not reflect legitimate market-based forces of supply and demand.

  f. Because Chemoil and later GLENCORE was pushing down the L.A. Bunker Fuel price assessment, Trading Firm A was able to buy fuel oil from National Oil Company A at artificially low prices, which increased the profit to the Joint Venture (and ultimately Chemoil and later GLENCORE) when the fuel oil was sold at market prices in Singapore, and resulted in unlawful gains to the Joint Venture.

  g. The Joint Venture engaged in 26 different transactions, which resulted in ill-gotten gains of over $70 million, which Trading Firm A and Chemoil, and later GLENCORE, evenly divided.

*USGC HSFO*

  h. On numerous occasions from January 2011 through August 2019, employees at GLENCORE and Chemoil submitted bids and offers to Platts during the Platts Window for USGC HSFO with the intent to cause an artificial price, that is with the intent to push the USGC HSFO price assessment up or down artificially so that the USGC HSFO price assessment did not reflect legitimate market-based forces of supply and demand and in order to unlawfully enrich themselves, GLENCORE, and Chemoil by increasing profits and reducing costs on GLENCORE's and Chemoil's contracts for physical fuel oil, and/or increasing profits and reducing losses on GLENCORE's and Chemoil's derivative positions relating to USGC HSFO, where the price terms and/or value of those contracts and/or positions were set by reference to the USGC HSFO benchmark price assessment.

i. More specifically, if GLENCORE or Chemoil had a contract to sell fuel oil that was priced by reference to the USGC HSFO price assessment, or had a "long" derivative position related to USGC HSFO, it was in GLENCORE's or Chemoil's interest for the USGC HSFO price assessment to be as high as possible. Traders and salespeople at GLENCORE or Chemoil submitted bids to Platts and subsequently raised the price of those bids during the Platts Window for the express purpose of pushing up the USGC HSFO price assessment artificially and in a manner that did not reflect legitimate market-based forces of supply and demand.

ii. Conversely, if GLENCORE or Chemoil had a contract to buy fuel oil that was priced by reference to the USGC HSFO price assessment, or had a "short" derivative position related to USGC HSFO, it was in GLENCORE's or Chemoil's interest for the USGC HSFO price assessment to be as low as possible. Traders and salespeople at GLENCORE or Chemoil submitted offers to Platts and subsequently lowered the price of those offers during the Platts Window for the express purpose of pushing down the USGC HSFO assessment artificially and in a manner that did not reflect legitimate market-based forces of supply and demand.

i. GLENCORE and Chemoil, through its traders and salespeople, at times submitted these bids and offers for USGC HSFO to Platts during the Platts Window for the purpose of artificially affecting the USGC HSFO price assessment, and hence the value of GLENCORE's and Chemoil's physical contracts or derivative positions related to USGC HSFO, and not for any legitimate economic reason.

j. In total, Chemoil and GLENCORE unlawfully gained over $23 million from manipulating the USGC HSFO price assessment.

8. When engaged in the conspiracy to manipulate commodity prices, and as to each component of the conspiracy (relating to L.A. Bunker Fuel, the Joint Venture, and USGC HSFO), the traders and salespeople at Chemoil and GLENCORE were acting within the scope of their employment as employees of Chemoil and GLENCORE, and as agents of Chemoil and GLENCORE, and with the intent, at least in part, to benefit Chemoil and GLENCORE.

## Overt Acts

9. In furtherance of the conspiracy and to effect its unlawful object, within the District of Connecticut and elsewhere, GLENCORE, together with others, committed and caused to be committed at least one of the following overt acts, among others:

   a. In November 2012, GLENCORE had physical and derivative contracts priced by reference to the USGC HSFO price assessment that consisted of a total "long" position of at least 8.7 million barrels, meaning Glencore's combined position would benefit from a rise in the USGC HSFO price assessment. Across all the trading days in November 2012, GLENCORE traders submitted several bids, and no offers, to Platts and subsequently raised the price of their bids over 700 times during the Platts Window for USGC HSFO with the intent to push up the USGC HSFO price assessment, and hence the value of GLENCORE's combined physical and derivative positions, artificially and with the effect of moving up the price, resulting in an unlawful gain of hundreds of thousands of dollars to Glencore from the manipulation.

   b. In June 2015, the Joint Venture purchased approximately 700,000 barrels of fuel oil from National Oil Company A whose price was set by reference to the L.A. Bunker Fuel price assessment over the period of nine business days between June 18, 2015, and June 30, 2015 (with the Joint Venture's exposure varying between 50,000 and 106,667

barrels on each of the pricing days). On seven of the nine pricing days (with no trading activity by GLENCORE on the remaining two pricing days), a co-conspirator submitted one or more offers to Platts and subsequently lowered the price of the offer(s) between 20 and 38 times during the Platts Window for L.A. Bunker Fuel with the intent to push down the L.A. Bunker Fuel price assessment, and hence the price of fuel oil that Trading Firm A bought from National Oil Company A in connection with the Joint Venture, artificially in order to reduce the cost to the Joint Venture of purchasing fuel oil from National Oil Company A.

      c.      In August 2016, GLENCORE had a private, bilateral contract to purchase over 45,000 metric tons of fuel oil from Trading Firm A. The price term of the contract was set by reference to the L.A. Bunker Fuel price assessment minus a fixed premium over a period of five business days between August 23, 2016, and August 29, 2016 (meaning that GLENCORE's exposure was over 9,100 metric tons on each of the five pricing days). On each of the five pricing days, Marketer-1, acting at Heredia's direction, submitted one or more offers to Platts and subsequently lowered the price of the offer(s) more than 40 times during the Platts Window for L.A. Bunker Fuel with the intent to push down the L.A. Bunker Fuel price assessment, and hence the price of fuel oil bought from Trading Firm A, artificially in order to reduce the cost to GLENCORE of purchasing fuel oil from Trading Firm A.

All in violation of Title 18, United States Code, Section 371.

JOSEPH S. BEEMSTERBOER
ACTING CHIEF, FRAUD SECTION
CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE

AVI PERRY, DEPUTY CHIEF
MATTHEW F. SULLIVAN, TRIAL ATTORNEY
JOHN J. LIOLOS, TRIAL ATTORNEY

VANESSA ROBERTS AVERY
UNITED STATES ATTORNEY
DISTRICT OF CONNECTICUT

JONATHAN FRANCIS
ASSISTANT U.S. ATTORNEY