United States District Court
District of Connecticut
FILED AT HARTFORD
5/24 20 22
Dinah Milton Kinney, Clerk
By
Deputy Clerk

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA

v.                                      Criminal No. 3:22-cr-71

GLENCORE LTD.

Defendant.

## PLEA AGREEMENT

The United States of America, by and through the United States Department of Justice, Criminal Division, Fraud Section and the United States Attorney's Office for the District of Connecticut (collectively, the "Fraud Section and the Office"), and Defendant Glencore Ltd., by and through its undersigned attorneys, and through its authorized representative, pursuant to authority granted by the Defendant's Board of Directors, hereby submit and enter into this plea agreement (the "Agreement"), pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure. The terms and conditions of this Agreement are as follows:

### The Defendant's Agreement

1.      Pursuant to Fed. R. Crim. P. 11(c)(1)(C), the Defendant agrees to waive any right it may have to grand jury indictment or to challenge venue in the United States District Court for the District of Connecticut, and to plead guilty to a one-count criminal Information charging the Defendant with conspiracy to commit commodity price manipulation in violation of Title 18, United States Code, Section 371. The Defendant further agrees to persist in that plea through sentencing and, as set forth below, to cooperate fully with the Fraud Section and the Office in their investigation into the conduct described in this Agreement and the Statement of Facts attached hereto as Attachment A (the "Statement of Facts").

2.     The Defendant understands that, to be guilty of this offense, the following essential elements of the offense must be satisfied:

a.     an agreement existed among two or more persons, the object of which was an offense against the United States, namely, commodity price manipulation in violation of Title 7, United States Code, Section 13(a)(2);

b.     the Defendant knowingly and willfully joined in that conspiracy; and

c.     an overt act in furtherance of the conspiracy was committed by at least one of the alleged co-conspirators.

3.     The Defendant understands and agrees that this Agreement is between the Fraud Section, the Office, and the Defendant and does not bind any other component of the Department of Justice or any other federal, state, or local prosecuting, administrative, or regulatory authority. Nevertheless, the Fraud Section and the Office will bring this Agreement and the nature and quality of the conduct, cooperation, and remediation of the Defendant, its direct or indirect parent companies, subsidiaries, affiliates, and joint ventures, to the attention of other prosecuting authorities or other agencies, if requested by the Defendant.

4.     The Defendant agrees that this Agreement will be executed by an authorized corporate representative. The Defendant further agrees that a resolution duly adopted by the Defendant's Board of Directors in the form attached to this Agreement as Attachment B, authorizes the Defendant to enter into this Agreement and take all necessary steps to effectuate this Agreement, and that the signatures on this Agreement by the Defendant and its counsel are authorized by the Defendant's Board of Directors, on behalf of the Defendant.

5.     The Defendant agrees that it has the full legal right, power, and authority to enter into and perform all of its obligations under this Agreement.

6. The Defendant agrees to abide by all terms and obligations of this Agreement as described herein, including, but not limited to, the following:

  a. to plead guilty as set forth in this Agreement;

  b. to abide by all sentencing stipulations contained in this Agreement;

  c. to appear, through its duly appointed representatives, as ordered for all court appearances, and obey any other ongoing court order in this matter, consistent with all applicable U.S. and foreign laws, procedures, and regulations;

  d. to commit no further crimes;

  e. to be truthful at all times with the Court;

  f. to pay the applicable fine and special assessment;

  g. to cooperate fully with the Fraud Section and the Office as described in Paragraphs 10 and 11;

  h. to continue to implement a compliance and ethics program as described in Attachment C of this Agreement; and

  i. to retain an independent compliance monitor (the "Monitor") in accordance with Paragraphs 25 through 28 and Attachment D of this Agreement.

7. The Defendant represents that it has implemented and will continue to implement a compliance and ethics program designed to prevent and detect violations of U.S. federal law throughout its operations, including those of its affiliates, agents, and controlled joint ventures, including, but not limited to, the minimum elements set forth in Attachment C. Thirty days prior to the expiration of the Term, the Defendant, by the Chief Executive Officer and Head of Compliance of the Glencore Group, will certify to the Fraud Section, in the form of executing the document attached as Attachment F to this Agreement, that the Defendant has met its compliance

obligations pursuant to this Agreement.

8.    Except as otherwise provided in Paragraph 10 below in connection with the Defendant's cooperation obligations and in Paragraph 25 below in connection with the term of the Monitor, the Defendant's obligations under the Agreement shall last and be effective for a period beginning on the date on which the Information is filed and ending three years from the later of the date on which the Information is filed or the date on which the Monitor is retained by the Company, as described in Paragraphs 25–27 below (the "Term"). The Defendant agrees, however, that in the event the Fraud Section and the Office determine, in their sole discretion, that the Defendant has knowingly violated any provision of this Agreement or failed to completely perform or fulfill each of the Defendant's obligations under this Agreement, the Fraud Section and the Office, in their sole discretion, may impose an extension or extensions of the Term for up to a total additional time period of one year, without prejudice to the Fraud Section's and the Office's right to proceed as provided in Paragraphs 29–31 below. Any extension of the Term extends all terms of this Agreement, including the terms of the monitorship described in Attachment D, for an equivalent period. Conversely, in the event the Fraud Section and the Office find, in their sole discretion, that there exists a change in circumstances sufficient to eliminate the need for the monitorship in Attachment D, and that the other provisions of this Agreement have been satisfied, the Term may be terminated early, except for the Defendant's cooperation obligations described in Paragraph 10 below.

9.    Except as may otherwise be agreed in writing by the parties in connection with a particular transaction, the Defendant agrees that in the event that, during the Term of this Agreement, the Defendant undertakes any change in corporate form, including if it sells, merges, or transfers business operations that are material to the Defendant's consolidated operations, or to

the operations of any direct or indirect parent companies, subsidiaries, or affiliates involved in the conduct described in the attached Statement of Facts to this Agreement, as they exist as of the date of this Agreement, whether such sale is structured as a sale, asset sale, merger, transfer, or other change in corporate form, it shall include in any contract for sale, merger, transfer, or other change in corporate form a provision binding the purchaser, or any successor in interest thereto, to the obligations described in this Agreement. The purchaser or successor in interest must also agree in writing that the Fraud Section and the Office's ability to breach under this Agreement is applicable in full force to that entity. The Defendant agrees that the failure to include these provisions in the transaction will make any such transaction null and void. The Defendant shall provide notice to the Fraud Section and the Office at least 30 days prior to undertaking any such sale, merger, transfer, or other change in corporate form. The Fraud Section and the Office shall notify the Defendant prior to such transaction (or series of transactions) if either determines that the transaction(s) will have the effect of circumventing or frustrating the enforcement purposes of this Agreement, as determined in the sole discretion of the Fraud Section or the Office, in which case the Defendant agrees that such transaction(s) will not be consummated. In addition, if at any time during the Term of this Agreement, the Fraud Section or the Office determine in their sole discretion that the Defendant has engaged in a transaction(s) that has the effect of circumventing or frustrating the enforcement purposes of this Agreement, the Fraud Section or the Office may deem it a breach of this Agreement pursuant to Paragraphs 29 through 31. Nothing herein shall restrict the Defendant from indemnifying (or otherwise holding harmless) the purchaser or successor in interest for penalties or other costs arising from any conduct that may have occurred prior to the date of the transaction, so long as such indemnification does not have the effect of circumventing or frustrating the enforcement purposes of this Agreement, as determined by the

Fraud Section or the Office.

10.    The Defendant shall cooperate fully with the Fraud Section and the Office in any and all matters relating to the conduct described in this Agreement and the attached Statement of Facts, as well as any other conduct under investigation by the Fraud Section, the Office, or any other component of the Department of Justice at any time during the Term, until the later of the date upon which all investigations and prosecutions arising out of such conduct are concluded or the end of the Term. At the request of the Fraud Section or the Office, the Defendant shall also cooperate fully with other domestic or foreign law enforcement and regulatory authorities and agencies in any investigation of the Defendant, or its direct or indirect parent companies, subsidiaries, affiliates, or joint ventures, or any of its present or former officers, directors, employees, agents, and consultants, or any other party, in any and all matters relating to the conduct described in this Agreement and the attached Statement of Facts and other conduct under investigation by the Fraud Section and the Office or any other component of the Department of Justice. The Defendant's cooperation pursuant to this Paragraph is subject to applicable law and regulations, as well as valid claims of attorney-client privilege or attorney work product doctrine; however, the Defendant must provide to the Fraud Section and the Office a log of any information or cooperation that is not provided based on an assertion of law, regulation, or privilege, and the Defendant bears the burden of establishing the validity of any such an assertion. The Defendant agrees that its cooperation pursuant to this Paragraph shall include, but not be limited to, the following, subject to local law and regulations, including relevant data privacy and national security laws and regulations:

a.    The Defendant shall timely and truthfully disclose all factual information with respect to its activities, those of its direct or indirect parent companies, subsidiaries,

affiliates, and joint ventures, and those of its present and former directors, officers, employees, agents, and consultants, including any evidence or allegations and internal or external investigations, about which the Defendant has any knowledge or about which the Fraud Section or the Office may inquire. This obligation of truthful disclosure includes, but is not limited to, the obligation of the Defendant to provide to the Fraud Section and the Office, upon request, any document, record or other tangible evidence about which the Fraud Section or the Office may inquire of the Defendant.

b.     Upon request of the Fraud Section or the Office, the Defendant shall designate knowledgeable employees, agents, or attorneys to provide to the Fraud Section and the Office the information and materials described in Paragraph 10(a) above on behalf of the Defendant. It is further understood that the Defendant must at all times provide complete, truthful, and accurate information.

c.     The Defendant shall use its best efforts to make available for interviews or testimony, as requested by the Fraud Section and the Office, present or former officers, directors, employees, agents, and consultants of the Defendant. This obligation includes, but is not limited to, sworn testimony before a federal grand jury or in federal trials, as well as interviews with domestic or foreign law enforcement and regulatory authorities. Cooperation under this Paragraph shall include identification of witnesses who, to the knowledge of the Defendant, may have material information regarding the matters under investigation.

d.     With respect to any information, testimony, documents, records, or other tangible evidence provided to the Fraud Section or the Office pursuant to this Agreement, the Defendant consents to any and all disclosures, subject to applicable law and regulations,

to other governmental authorities including United States authorities and those of a foreign government of such materials as the Fraud Section or the Office, in its sole discretion, shall deem appropriate.

11.  In addition to the obligations provided for in the Paragraph 10 of the Agreement, during the Term, should the Defendant learn of any evidence or allegation of a criminal violation of U.S. federal law, the Defendant shall promptly report such evidence or allegation to the Fraud Section and the Office. Annually during the Term and during any additional period of cooperation that is longer than the Term, and thirty days after the expiration of the Defendant's cooperation obligation under Paragraph 10 of the Agreement, the Defendant, by two Officers of Glencore, Ltd., will submit the certification set forth in Attachment E and certify to the Fraud Section and the Office that the Defendant has met its disclosure obligations pursuant to this Paragraph. The certification will be deemed a material statement and representation by the Defendant to the executive branch of the United States for purposes of Title 18, United States Code, Sections 1001 and 1519, and it will be deemed to have been made in the District of Connecticut.

12.  The Defendant agrees that any fine or restitution imposed by the Court will be due and payable in full within ten business days of the entry of judgment and that the Defendant will not attempt to avoid or delay payment. The Defendant further agrees to pay the Clerk of the Court for the United States District Court for the District of Connecticut the mandatory special assessment of $400 on the date of sentencing.

## The United States' Agreement

13.     The Fraud Section and the Office enter into this Agreement based on the individual facts and circumstances presented by this case and the Defendant, including:

a.     the nature and seriousness of the offense conduct that, among other things, involved the manipulation of two fuel oil benchmark price assessments over a period of years concluding in 2019; occurred in part while the Defendant was aware that it was under active investigation for the same conduct by the United States Commodity Futures Trading Commission ("CFTC") beginning in 2015; was undertaken by fuel oil traders and salespeople with the knowledge and consent of at least one senior executive of the Defendant as of approximately 2015 and of operations and risk management personnel; and artificially impacted the price of fuel oil for cargo ships and other vessels in two of the nation's busiest commercial shipping ports, resulting in substantial unlawful gains to the Defendant of approximately $144,417,203, and to all co-conspirators of approximately $179,590,359;

b.     the Defendant did not receive voluntary disclosure credit pursuant to the Corporate Enforcement Policy in the Department of Justice Manual ("JM") § 9-47.120, or pursuant to the United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines"), because it did not voluntarily and timely disclose to the Fraud Section and the Office the conduct described in the attached Statement of Facts;

c.     the Defendant received credit for cooperation under U.S.S.G. § 8C2.5(g)(2), because it cooperated with the Fraud Section's and the Office's investigation and demonstrated recognition and affirmative acceptance of responsibility for its criminal conduct; the Defendant also received partial credit for its cooperation with the Fraud

-9-

Section's and the Office's investigation pursuant to the Corporate Enforcement Policy, JM § 9-47.120, by, among other things, expeditiously producing voluminous documents to avoid delaying the Fraud Section's and the Office's investigation, producing a limited set of documents from foreign countries in ways that did not implicate foreign data privacy law prohibitions, and engaging a data consulting firm to analyze trading activity and present that analysis to the Fraud Section and the Office; in addition, the Defendant also provided to the Fraud Section and the Office all relevant facts known to it, including information about the individuals involved in the conduct described in the attached Statement of Facts and conduct disclosed to the Fraud Section and the Office prior to the Agreement;

d.      the Defendant did not receive full credit pursuant to the Corporate Enforcement Policy, JM § 9-47.120, for its cooperation because the Defendant presented its data analysis only after the Fraud Section's and the Office's investigation was substantially complete, did not otherwise make regular and detailed factual presentations to the Fraud Section and the Office, and did not proactively identify any important information or documents for the Fraud Section and the Office, or for its remediation because the Defendant did not take adequate disciplinary measures with respect to certain senior personnel and other employees involved in, or aware of, the conduct described in the attached Statement of Facts;

e.      the Defendant had an inadequate and ineffective compliance program and internal controls during the period of the conduct described in the attached Statement of Facts, including the absence of an electronic trade surveillance program; however, the Defendant has enhanced its compliance program by, among other things, increasing its

annual compliance operating budget and adding more than 45 full-time equivalent compliance positions, hiring and promoting compliance personnel with the necessary experience and skills, improving its compliance technology infrastructure, improving its anti-manipulation training and policies, developing an electronic trade surveillance program, and undertaking regular, periodic risk assessments;

      f.     the Defendant has committed to continuing to enhance its compliance program and internal controls, including ensuring that its compliance program satisfies the minimum elements set forth in Attachment C to this Agreement (Corporate Compliance Program);

      g.     based on the state of the Defendant's compliance program and the progress of its remediation, including the fact that certain of the Defendant's remedial improvements to its compliance program and internal market controls have not been fully implemented or tested to demonstrate that they would prevent and detect similar misconduct in the future, the Fraud Section and the Office determined that an independent compliance monitor was necessary as set forth in Paragraphs 25–28 below and Attachment D to this Agreement (Independent Compliance Monitor); and

      h.     the Defendant has no prior criminal history and only a limited history of regulatory enforcement action;

      i.     accordingly, after considering (a) through (h) above, the Fraud Section and the Office determined that the starting point for determining the Defendant's fine amount should be the top quartile of the applicable U.S. Sentencing Guidelines fine range, and that the Defendant should receive a discount of five percent off the otherwise-applicable fine amount under the Corporate Enforcement Policy;

j.   the Defendant has agreed to continue to cooperate with the Fraud Section and the Office as described in Paragraphs 10 and 11;

k.   the Defendant has agreed to forfeit $144,417,203, which represents proceeds to the Defendant traceable to the conduct described in the attached Statement of Facts; and

l.   the Defendant has agreed to enter into a separate resolution with the CFTC relating, in part, to the conduct described in the attached Statement of Facts.

14.   In exchange for the guilty plea of the Defendant and the complete fulfillment of all of its obligations under this Agreement, the Fraud Section and the Office agree they will not file additional criminal charges against the Defendant or any of its direct or indirect parent companies, subsidiaries, affiliates, or joint ventures relating to any of the conduct described in the Information or in the Statement of Facts, or information made known to the Fraud Section and the Office prior to the date of the Agreement. The Fraud Section and the Office, however, may use any information related to the conduct described in the Statement of Facts against the Defendant: (a) in a prosecution for perjury or obstruction of justice; (b) in a prosecution for making a false statement; (c) in a prosecution or other proceeding relating to any crime of violence; or (d) in a prosecution or other proceeding relating to a violation of any provision of Title 26 of the United States Code. This Agreement does not provide any protection against prosecution for any future conduct by the Defendant or by any of its affiliates, subsidiaries, officers, directors, employees, agents or consultants whether or not disclosed by the Defendant pursuant to the terms of this Agreement. In addition, this Agreement does not provide any protection against prosecution of any individuals, regardless of their affiliation with the Defendant. The Defendant agrees that nothing in this Agreement is intended to release the Defendant from any and all of the Defendant's tax liabilities

and reporting obligations for any and all income not properly reported and/or legally or illegally obtained or derived.

## Factual Basis

15.     The Defendant is pleading guilty because it is guilty of the charge contained in the Information. The Defendant admits, agrees, and stipulates that the factual allegations set forth in the Information and Statement of Facts are true and correct, that it is responsible for the acts of its officers, directors, employees, and agents described in the Information and Statement of Facts, and that the Information and Statement of Facts accurately reflect the Defendant's criminal conduct. The Defendant stipulates to the admissibility of the Statement of Facts in any proceeding by the Fraud Section or the Office, including any trial, guilty plea, or sentencing proceeding, and will not contradict anything in the attached Statement of Facts at any such proceeding.

## The Defendant's Waiver of Rights, Including the Right to Appeal

16.     Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410 limit the admissibility of statements made in the course of plea proceedings or plea discussions in both civil and criminal proceedings, if the guilty plea is later withdrawn. The Defendant expressly warrants that it has discussed these rules with its counsel and understands them. Solely to the extent set forth below, the Defendant voluntarily waives and gives up the rights enumerated in Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410. The Defendant agrees that, effective as of the date the Defendant signs this Agreement, it will not dispute the Statement of Facts set forth in this Agreement, and that the Statement of Facts shall be admissible against the Defendant in any criminal case involving the Fraud Section or the Office, as: (a) substantive evidence offered by the government in its case-in-chief and rebuttal case; (b) impeachment evidence offered by the government on cross-examination; and (c) evidence at any sentencing

hearing or other hearing. In addition, the Defendant also agrees not to assert any claim under the Federal Rules of Evidence (including Rule 410 of the Federal Rules of Evidence), the Federal Rules of Criminal Procedure (including Rule 11 of the Federal Rules of Criminal Procedure), or the Sentencing Guidelines (including USSG § 1B1.1(a)) that the Statement of Facts set forth in this Agreement should be suppressed or is otherwise inadmissible as evidence (in any form). Specifically, the Defendant understands and agrees that any statements that it makes in the course of its guilty plea or in connection with the Agreement are admissible against it for any purpose in any U.S. federal criminal proceeding if, even though the Fraud Section and the Office have fulfilled all of their obligations under this Agreement and the Court has imposed the agreed-upon sentence, the Defendant nevertheless withdraws its guilty plea.

17. The Defendant is satisfied that the Defendant's attorneys have rendered effective assistance. The Defendant understands that by entering into this Agreement, the Defendant surrenders certain rights as provided in this Agreement. The Defendant understands that the rights of criminal defendants include the following:

   a. the right to plead not guilty and to persist in that plea;

   b. the right to a jury trial;

   c. the right to be represented by counsel, and if necessary have the court appoint counsel, at trial and at every other stage of the proceedings;

   d. the right at trial to confront and cross-examine adverse witnesses, to be protected from compelled self-incrimination, to testify and present evidence, and to compel the attendance of witnesses; and

   e. pursuant to Title 18, United States Code, Section 3742, the right to appeal the sentence imposed.

Nonetheless, the Defendant knowingly waives these rights and the right to appeal or collaterally attack the conviction and any sentence within the statutory maximum described below (or the manner in which that sentence was determined) on the grounds set forth in Title 18, United States Code, Section 3742, or on any ground whatsoever except those specifically excluded in this Paragraph, in exchange for the concessions made by the Fraud Section and the Office in this Agreement. This Agreement does not affect the rights or obligations of the United States as set forth in Title 18, United States Code, Section 3742(b). The Defendant also knowingly waives the right to bring any collateral challenge attacking either the conviction or the sentence imposed in this case. The Defendant hereby waives all rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including without limitation any records that may be sought under the Freedom of Information Act, Title 5, United States Code, Section 552, or the Privacy Act, Title 5, United States Code, Section 552a. The Defendant waives all defenses based on the statute of limitations and venue with respect to any prosecution related to the conduct described in the Information and Statement of Facts, including any prosecution that is not time-barred on the date that this Agreement is signed in the event that: (a) the conviction is later vacated for any reason; (b) the Defendant violates this Agreement; or (c) the plea is later withdrawn, provided such prosecution is brought within one year of any such vacation of conviction, violation of the Agreement, or withdrawal of plea plus the remaining time period of the statute of limitations as of the date that this Agreement is signed. The Fraud Section and the Office are free to take any position on appeal or any other post-judgment matter. The parties agree that any challenge to the Defendant's sentence that is not foreclosed by this Paragraph will be limited to that portion of the sentencing calculation that is inconsistent with (or not addressed by)

-15-

this waiver. Nothing in the foregoing waiver of appellate and collateral review rights shall preclude the Defendant from raising a claim of ineffective assistance of counsel in an appropriate forum.

## Penalty

18.     The statutory maximum sentence that the Court can impose on the Defendant for a violation of Title 18, United States Code, Section 371, is a fine of $500,000 or twice the gross pecuniary gain or gross pecuniary loss resulting from the offense, whichever is greatest (Title 18, United States Code, Sections 371, 3571(c), and 3571(d)); five years' probation (Title 18, United States Code, Section 3561(c)(1)); a mandatory special assessment of $400 (Title 18, United States Code, Section 3013(a)(2)(B)); and restitution in the amount of any victims' losses as ordered by the Court. In this case, the parties agree that the gross pecuniary gain to all co-conspirators resulting from the offense is $179,590,359. Therefore, pursuant to Title 18, United States Code, Section 3571(d), the maximum fine that may be imposed is twice the gross pecuniary gain, or $359,180,718.

## Sentencing Recommendation

19.     The parties agree that pursuant to *United States v. Booker*, 543 U.S. 220 (2005), the Court must determine an advisory Sentencing Guidelines range. The Court will then determine a reasonable sentence within the statutory range after considering the advisory Sentencing Guidelines range and the factors listed in Title 18, United States Code, Section 3553(a). The parties' agreement herein to any guideline sentencing factors constitutes proof of those factors sufficient to satisfy the applicable burden of proof. The Defendant also understands that if the Court accepts this Agreement, the Court is bound by the sentencing provisions in Paragraph 21.

20.     The parties agree that a faithful application of the Sentencing Guidelines to determine the applicable fine range yields the following analysis:

a. The 2018 U.S.S.G. are applicable to this matter.

b. <u>Offense Level</u>. Based upon U.S.S.G. § 2B1.1, the total offense level is 34, calculated as follows:

| | | |
|---|---|---|
| (a)(1) | Base Offense Level | 6 |
| (b)(1)(N) | Gain of more than $150,000,000 | +26 |
| (b)(10) | Sophisticated Means | +2 |
| **TOTAL** | | **34** |

c. <u>Base Fine</u>. Based upon U.S.S.G. § 8C2.4(a)(2), the base fine is $179,590,359 (the pecuniary gain to all co-conspirators from the offense)

d. <u>Culpability Score</u>. Based upon U.S.S.G. § 8C2.5, the culpability score is 6, calculated as follows:

| | | |
|---|---|---|
| (a) | Base Culpability Score | 5 |
| (b)(3) | The organization has 200 or more employees and an individual within high-level personnel of the organization participated in, condoned, or was willfully ignorant of the offense | +3 |
| (g)(2) | The organization fully cooperated in the investigation, and clearly demonstrated recognition and affirmative acceptance of responsibility for its criminal conduct | -2 |
| **TOTAL** | | **6** |

<u>Calculation of Fine Range</u>:

| | |
|---|---|
| Base Fine (U.S.S.G. § 8C2.4(a)(2)) | $179,590,359 |
| Multipliers (U.S.S.G. § 8C2.6) | 1.20 (min)/2.40 (max) |
| Fine Range (U.S.S.G. § 8C2.7) | $215,508,430 to $431,016,861 |
| Statutory Maximum Fine (18 U.S.C. § 3571(d)) | $359,180,718 |

21.     Pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, the Fraud Section, the Office, and the Defendant agree that the following represents the appropriate disposition of the case:

a.      Disposition. Pursuant to Fed. R. Crim. P. 11(c)(1)(C), the Fraud Section, the Office, and the Defendant agree to recommend jointly that the Court impose a sentence requiring the Defendant to pay a criminal fine of $341,221,682 and criminal forfeiture of $144,417,203 within ten business days of the entry of judgment.

b.      Forfeiture. The Defendant hereby admits and acknowledges that in connection with the criminal conduct as charged in Count One of the Information, at least $144,417,203 in proceeds was obtained unlawfully. Pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461, the Defendant agrees to forfeit $144,417,203 (the "Forfeiture Amount"), representing the amount of proceeds traceable to the violation set forth in Count One of the Information and agrees to the imposition of an Order of Forfeiture against it and in favor of the United States in that amount. The Defendant acknowledges that more than $144,417,203 in actual proceeds have been dissipated or have been commingled with other property which cannot be divided without difficulty, such that the actual proceeds are no longer readily identifiable and available. Defendant therefore stipulates and admits that one or more of the conditions set forth in Title 21, United States Code, Section 853(p), exists. No later than ten business days after the entry of judgment, the Defendant shall cause the transfer of the Forfeiture Amount, plus any associated transfer fees, pursuant to payment instructions provided by the United States (with $35,000,000 of the Forfeiture Amount to be paid into the United States Postal Inspection Service Consumer Fraud Fund) in order to fully satisfy the

-18-

forfeiture money judgment. The Defendant consents to the entry of the Proposed Order of Forfeiture annexed hereto as Attachment G and agrees pursuant to Federal Rule of Criminal Procedure 32.2(b)(4)(A) that the Order of Forfeiture shall be final as to the Defendant at the time it is ordered by the Court.

c.      The Fraud Section and the Office agree that 50% of the fine ($170,610,841) and 50% of the criminal forfeiture amounts ($72,208,601) for a total of $242,819,442 will be offset by any payment made by the Defendant pursuant to the May 24, 2022 order and settlement between the Defendant and the CFTC relating to the conduct described in the attached Statement of Facts. The Fraud Section, the Office, and the Defendant agree that the fine and criminal forfeiture amounts are appropriate given the facts and circumstances of this case, including the factors described in Paragraph 13(a) through 13(h). The amount of the fine is final and shall not be refunded. Furthermore, nothing in this Agreement shall be deemed an agreement by the Fraud Section or the Office that the fine is the maximum criminal monetary penalty that may be imposed in any future prosecution following a breach by the Defendant, and the Fraud Section and the Office are not precluded from arguing in any such future prosecution that the Court should impose a higher fine, although the Fraud Section and the Office agree that under those circumstances, they will recommend to the Court that any amount paid under this Agreement should be offset against any fine the Court imposes as part of a future judgment. The Defendant shall not seek or accept, directly or indirectly, reimbursement or indemnification from any source, other than its direct or indirect parent companies, with regard to the fine or criminal forfeiture amounts that the Defendant pays pursuant to the Agreement or any other agreement entered into with an enforcement authority or regulator concerning the facts set

forth in the attached Statement of Facts. The Defendant further acknowledges that no tax deduction may be sought in connection with the payment of any part of the $341,221,682 fine and $144,417,203 in criminal forfeiture. The Fraud Section and the Office believe that a disposition that includes a fine of $341,221,682 and $144,417,203 in criminal forfeiture is appropriate based on the factors outlined in Paragraph 13 of the Agreement and those in Title 18, United States Code, Sections 3553(a) and 3572.

       d.    <u>Mandatory Special Assessment</u>. The Defendant shall pay to the Clerk of the Court for the United States District Court for the District of Connecticut on the date of sentencing the mandatory special assessment of $400.

       e.    <u>Restitution</u>. The Fraud Section, the Office, and the Defendant agree that the amount of loss resulting from the offense cannot be reasonably determined, and thus the parties believe there is no basis for an order of restitution. The Defendant recognizes and agrees, however, that restitution is imposed at the sole discretion of the Court. The Defendant agrees to pay restitution as part of the Agreement in the event restitution is ordered by the Court.

       f.    <u>Probation</u>. The Fraud Section, the Office, and the Defendant agree that a term of organizational probation for a period of three years shall be imposed on the Defendant pursuant to Title 18, United States Code, Sections 3551(c)(1) and 3561(c)(1). The parties agree, pursuant to U.S.S.G. § 8D1.4, that the term of probation shall include as conditions the obligations set forth in Paragraphs 10 and 11 above as well as the payments of the fine and forfeiture amounts set forth in Paragraph 21(a).

22.    This Agreement is presented to the Court pursuant to Fed. R. Crim. P. 11(c)(1)(C). The Defendant understands that, if the Court rejects this Agreement, the Court must: (a) inform

the parties that the Court rejects the Agreement; (b) advise the Defendant's counsel that the Court is not required to follow the Agreement and afford the Defendant the opportunity to withdraw its plea; and (c) advise the Defendant that if the plea is not withdrawn, the Court may dispose of the case less favorably toward the Defendant than the Agreement contemplated. The Defendant further understands that if the Court refuses to accept any provision of this Agreement, neither party shall be bound by the provisions of the Agreement.

23.     The Fraud Section, the Office, and the Defendant jointly submit that this Agreement, together with the record that will be created by the Fraud Section, the Office, and the Defendant at the plea and sentencing hearings, will provide sufficient information concerning the Defendant, the crime charged in this case, and the Defendant's role in the crime to enable a meaningful exercise of sentencing authority by the Court under Title 18, United States Code, Section 3553.

24.     The Fraud Section, the Office, and the Defendant agree, subject to the Court's approval, to waive the requirement for a Presentence Investigation Report ("PSR"), pursuant to Federal Rule of Criminal Procedure 32(c)(1)(A), based on a finding by the Court that the record contains information sufficient to enable the Court to meaningfully exercise its sentencing authority and to seek sentencing by the Court immediately following the Rule 11 plea hearing. However, the parties agree that in the event the Court orders that the entry of the guilty plea and sentencing occur at separate proceedings, such an order will not affect the Agreement set forth herein. The Defendant understands that the decision whether to proceed with the sentencing proceeding without a PSR is exclusively that of the Court. Additionally, if the Court directs the preparation of a PSR, the Fraud Section and the Office will fully inform the preparer of the PSR and the Court of the facts and law related to the Defendant's case. At the time of the plea hearing,

the parties will suggest mutually agreeable and convenient dates for the sentencing hearing with adequate time for any objections to the PSR and for consideration by the Court of the PSR and the parties' sentencing submissions.

## Independent Compliance Monitor

25.     Promptly after the Fraud Section and the Office's selection pursuant to Paragraph 26 below, the Defendant agrees to retain a Monitor. The Monitor's term shall be three years from the date on which the Monitor is retained by the Defendant, subject to extension or early termination as described in Paragraph 8. The Monitor's duties and authority, and the obligations of the Defendant with respect to the Monitor and the Fraud Section and the Office, are set forth in Attachment D, which is incorporated by reference into this Agreement. Within 30 business days after the date of execution of this Agreement, the Defendant shall submit a written proposal to the Fraud Section and the Office identifying three monitor candidates, and, at a minimum, providing the following:

a.      a description of each candidate's qualifications and credentials in support of the evaluative considerations and factors listed below;

b.      a written certification by the Defendant that it will not employ or be affiliated with the Monitor for a period of not less than two years from the date of the termination of the monitorship;

c.      a written certification by each of the candidates that he/she is not a current or recent (*i.e.*, within the prior two years) employee, agent, or representative of the Defendant, or its direct or indirect parent companies, subsidiaries, affiliates, or joint ventures, and holds no interest in, and has no relationship with, the Defendant, its direct or indirect parent companies, subsidiaries, affiliates, joint ventures or related entities, or its

employees, officers, or directors;

    d.     a written certification by each of the candidates that he/she has notified any clients that the candidate represents in a matter involving the Fraud Section or the Office (or any other U.S. Department of Justice component) handling the monitor selection process, and that the candidate has either obtained a waiver from those clients or has withdrawn as counsel in the other matter(s); and

    e.     a statement identifying the monitor candidate that is the Defendant's first, second, and third choice to serve as the Monitor.

26.    The monitor candidates or their team members shall have, at a minimum, the following qualifications:

    a.     demonstrated expertise with respect to the Commodity Exchange Act, Title 7, United States Code, Section 1, *et seq.*, and in particular, the anti-manipulation provisions of the Act;

    b.     a thorough understanding of commodities trading practices;

    c.     experience designing and/or reviewing corporate compliance policies, procedures, and internal controls, including detective controls such as trade surveillance and electronic communication surveillance;

    d.     the ability to access and deploy resources as necessary to discharge the Monitor's duties as described in the Agreement; and

    e.     sufficient independence from the Defendant to ensure effective and impartial performance of the Monitor's duties as described in the Agreement.

27.    The Fraud Section and the Office retain the right, in their sole discretion, to choose the Monitor from among the candidates proposed by the Defendant. Monitor selections shall be

made in keeping with the Department's commitment to diversity and inclusion. If the Fraud Section and the Office determine, in their sole discretion, that any of the three candidates lack the requisite qualifications, or if the Fraud Section and the Office, in their exclusive discretion, is not satisfied with the candidates proposed, the Fraud Section and the Office shall notify the Company and request that the Company propose another candidate or candidates within twenty (20) business days. This process shall continue until a Monitor acceptable to both parties is chosen. The Fraud Section, the Office, and the Defendant will use their best efforts to complete the selection process within 60 business days of the execution of this Agreement. The Fraud Section and the Office retain the right to determine that the Monitor should be removed if, in the Fraud Section and the Office's sole discretion, the Monitor fails to conduct the monitorship effectively, fails to comply with this Agreement, or no longer meets the qualifications outlined in Paragraph 26 above. If the Monitor resigns, is removed, or is otherwise unable to fulfill his or her obligations as set out herein and in Attachment D, the Defendant shall within 20 business days recommend a pool of three qualified Monitor candidates from which the Fraud Section and the Office will choose a replacement, following the process outlined above.

28.    The Monitor's powers, duties, and responsibilities, as well as additional circumstances that may support an extension of the Monitor's term, are set forth in Attachment D. The Defendant agrees that it will not employ or be affiliated with the Monitor or the Monitor's firm for a period of not less than two years from the date on which the Monitor's term expires. Nor will the Defendant discuss with the Monitor or the Monitor's firm the possibility of further employment or affiliation for a period of two years after the Monitor's term. Upon agreement by the parties, this prohibition will not apply to other monitorship responsibilities that the Monitor or

the Monitor's firm may undertake in connection with resolutions with foreign or other domestic authorities.

## **Breach of Agreement**

29.     If the Defendant (a) commits any felony under U.S. federal law; (b) provides in connection with this Agreement deliberately false, incomplete, or misleading information; (c) fails to cooperate as set forth in Paragraphs 10 and 11 of this Agreement; (d) fails to implement a compliance program as set forth in Paragraph 6(h) of this Agreement and Attachment C; or (e) otherwise fails specifically to perform or to fulfill completely each of the Defendant's obligations under the Agreement, regardless of whether the Fraud Section and the Office become aware of such a breach after the Term, the Defendant shall thereafter be subject to prosecution for any federal criminal violation of which the Fraud Section and the Office have knowledge, which may be pursued by the Fraud Section, the Office in the U.S. District Court for the Connecticut, or any other United States Attorney's Office. Determination of whether the Defendant has breached the Agreement and whether to pursue prosecution of the Defendant shall be in the Fraud Section's and the Office's sole discretion. Any such prosecution may be premised on information provided by the Defendant or its personnel. Any such prosecution relating to the conduct described in the Information and the attached Statement of Facts or relating to conduct known to the Fraud Section and the Office prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against the Defendant, notwithstanding the expiration of the statute of limitations, between the signing of this Agreement and the expiration of the Term plus one year. Thus, by signing this Agreement, the Defendant agrees that the statute of limitations with respect to any such prosecution that is not time-barred on the date of the signing of this Agreement shall be tolled for

the Term plus one year. The Defendant gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such prosecution or action, except to the extent that such defenses existed as of the date of the signing of this Agreement. In addition, the Defendant agrees that the statute of limitations as to any violation of federal law that occurs during the term of the cooperation obligations provided for in Paragraphs 10 and 11 of the Agreement will be tolled from the date upon which the violation occurs until the earlier of the date upon which the Fraud Section and the Office are made aware of the violation or the duration of the Term plus five years, and that this period shall be excluded from any calculation of time for purposes of the application of the statute of limitations.

30.     In the event the Fraud Section and the Office determine that the Defendant has breached this Agreement, the Fraud Section and the Office agree to provide the Defendant with written notice of such breach prior to instituting any prosecution resulting from such breach. Within thirty days of receipt of such notice, the Defendant shall have the opportunity to respond to the Fraud Section and the Office in writing to explain the nature and circumstances of such breach, as well as the actions the Defendant has taken to address and remediate the situation, which explanation the Fraud Section and the Office shall consider in determining whether to pursue prosecution of the Defendant.

31.     In the event that the Fraud Section and the Office determine that the Defendant has breached this Agreement: (a) all statements made by or on behalf of the Defendant to the Fraud Section and the Office or to the Court, including the Information and the attached Statement of Facts, and any testimony given by the Defendant before a grand jury, a court, or any tribunal, or at any legislative hearings, whether prior or subsequent to this Agreement, and any leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal

proceedings brought by the Fraud Section or the Office against the Defendant; and (b) the Defendant shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that any such statements or testimony made by or on behalf of the Defendant prior or subsequent to this Agreement, or any leads derived therefrom, should be suppressed or are otherwise inadmissible. The decision whether conduct or statements of any current director, officer or employee, or any person acting on behalf of, or at the direction of, the Defendant, will be imputed to the Defendant for the purpose of determining whether the Defendant has violated any provision of this Agreement shall be in the sole discretion of the Fraud Section or the Office.

32.     The Defendant acknowledges that the Fraud Section and the Office have made no representations, assurances, or promises concerning what sentence may be imposed by the Court if the Defendant breaches this Agreement and is subsequently prosecuted for any crime, or if the breach constitutes a violation of the Defendant's probation. The Defendant further acknowledges that any such sentence is solely within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of such discretion.

## Public Statements by the Defendant

33.     The Defendant expressly agrees that it shall not, through present or future attorneys, officers, directors, employees, agents, or any other person authorized to speak for the Defendant make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by the Defendant set forth above or the facts described in the Information and the attached Statement of Facts. Any such contradictory statement shall constitute a breach of this Agreement, and the Defendant thereafter shall be subject to prosecution as set forth in Paragraphs 29–31 of this Agreement. The decision whether any public statement by any such person contradicting a

fact contained in the Information or the attached Statement of Facts will be imputed to the Defendant for the purpose of determining whether it has breached this Agreement shall be at the sole discretion of the Fraud Section and the Office. The Defendant shall be permitted to raise defenses and to assert affirmative claims in other proceedings relating to the matters set forth in the Information and the attached Statement of Facts provided that such defenses and claims do not contradict, in whole or in part, a statement contained in the Information or the attached Statement of Facts. This Paragraph does not apply to any statement made by any present or former officer, director, employee, or agent of the Defendant in the course of any criminal, regulatory, or civil case initiated against such individual, unless such individual is speaking on behalf of the Defendant.

34.     The Defendant agrees that if it or any of its direct or indirect parent companies, subsidiaries, affiliates, or joint ventures issues a press release or holds any press conference in connection with this Agreement, the Defendant shall first consult the Fraud Section and the Office to determine (a) whether the text of the release or proposed statements at the press conference are true and accurate with respect to matters between the Fraud Section, the Office, and the Defendant; and (b) whether the Fraud Section and the Office has any objection to the release or statement.

## Complete Agreement

35.     This document states the full extent of the Agreement between the parties. There are no other promises or agreements, express or implied. Any modification of this Agreement shall be valid only if set forth in writing in a supplemental or revised plea agreement signed by all parties.

**AGREED:**

**FOR GLENCORE LTD.:**

Date: 5/24/2022

By: _____
Cheryl Driscoll
Corporate Secretary
Glencore Ltd.

Date: 5/24/2022

By: _____
Howard Shapiro
Christopher Davies
Wilmer Cutler Pickering Hale and Dorr LLP
Counsel for Glencore Ltd.

**FOR THE DEPARTMENT OF JUSTICE:**

JOSEPH S. BEEMSTERBOER
Acting Chief, Fraud Section
Criminal Division
U.S. Department of Justice

Date: May 24, 2022

By: _____
Avi Perry, Deputy Chief
Matthew Sullivan, Trial Attorney
John J. Liolos, Trial Attorney

VANESSA ROBERTS AVERY
United States Attorney
District of Connecticut

Date: 5/24/22

By: _____
Jonathan Francis
Assistant United States Attorney

## GLENCORE LTD. OFFICER'S CERTIFICATE

I have read this Agreement and carefully reviewed every part of it with the Glencore Group General Counsel and outside counsel for Glencore Ltd. (the "Company"). I understand the terms of this Agreement and voluntarily agree, on behalf of the Company, to each of its terms. Before signing this Agreement, I consulted outside counsel for the Company. Counsel fully advised me of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into this Agreement.

The Board of Directors of the Company has carefully reviewed the terms of this Agreement. The Glencore Group General Counsel together with outside counsel for the Company have advised the Board of Directors fully of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into the Agreement.

No promises or inducements have been made other than those contained in this Agreement. Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing this Agreement on behalf of the Company, in any way to enter into this Agreement. I am also satisfied with outside counsel's representation in this matter. I certify that I am an Officer for the Company and that I have been duly authorized by the Company to execute this Agreement on behalf of the Company.

Date: 5|24|2022          By: _____
                              Cheryl Driscoll
                              Corporate Secretary
                              Glencore Ltd.

## CERTIFICATE OF COUNSEL FOR GLENCORE LTD.

I am counsel for Glencore Ltd. (the "Company") in the matter covered by this Agreement. In connection with such representation, I have examined relevant Company documents and have discussed the terms of this Agreement with the Company's Board of Directors. Based on our review of the foregoing materials and discussions, I am of the opinion that the representative of the Company has been duly authorized to enter into this Agreement on behalf of the Company and that this Agreement has been duly and validly authorized, executed, and delivered on behalf of the Company and is a valid and binding obligation of the Company. Further, I have carefully reviewed the terms of this Agreement with the Board of Directors of the Company and with the Glencore Group General Counsel. I have fully advised them of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions and of the consequences of entering into this Agreement. To my knowledge, the decision of the Company to enter into this Agreement, based on the authorization of the Board of Directors, is an informed and voluntary one.

Date: MAY 24, 2022

By: _____
Howard Shapiro
Christopher Davies
Wilmer Cutler Pickering Hale and Dorr LLP
Counsel for Glencore Ltd.

**ATTACHMENT A**

**<u>STATEMENT OF FACTS</u>**

The following Statement of Facts is incorporated by reference as part of the Plea Agreement between the United States Department of Justice, Criminal Division, Fraud Section and the United States Attorney's Office for the District of Connecticut (collectively, the "Fraud Section and the Office") and Glencore Ltd. ("Glencore"). Glencore hereby agrees and stipulates that the following information is true and accurate. Glencore admits, accepts, and acknowledges that it is responsible for the acts of its officers, directors, employees, and agents as set forth below. Had this matter proceeded to trial, Glencore acknowledges that the Fraud Section and the Office would have proven beyond a reasonable doubt, by admissible evidence, the facts alleged below and set forth in the criminal Information:

*Relevant Entities*

1.  At all times relevant to this Statement of Facts, Glencore operated a global commodities trading business that included trading in fuel oil and related petroleum products. Glencore was a branch of Glencore AG, which was a subsidiary of Glencore International AG and whose ultimate parent company was Glencore plc. Until mid-2017, Glencore was based in Stamford, Connecticut. Thereafter, it was based in New York, New York.

2.  Chemoil Corporation ("Chemoil"), together with its subsidiaries and affiliates, was an oil trading company that was headquartered in Singapore and had offices in, among other places, San Francisco, California. Chemoil operated a global commodities trading business that included the trading in fuel oil and related products. At all times relevant to this Statement of Facts

prior to April 2014,[1] Glencore plc indirectly held a majority ownership stake in Chemoil. More specifically, in January 2010, Glencore plc indirectly acquired a 50.81% stake in Chemoil, with Glencore plc raising its stake in Chemoil to 89% in February 2012, and then fully acquiring indirect ownership of Chemoil in April 2014.

### S&P Global Platts Benchmark Price Assessments

3.      S&P Global Platts ("Platts") is a leading independent provider of information, benchmark prices, and analytics for energy and other commodities markets. Among other things, Platts published daily price assessments for various fuel oil markets throughout the United States and internationally, including for intermediate fuel oil 380 CST at the Port of Los Angeles ("L.A. Bunker Fuel") and RMG 380 fuel oil at the Port of Houston ("USGC HSFO"). The Port of Los Angeles is the busiest shipping port in the United States by container volume. The Port of Houston is the largest U.S. port on the Gulf Coast and the busiest port in the United States by foreign waterborne tonnage.

4.      Platts daily price assessments were meant to reflect the prevailing market price at a point in time for the specific product that was the subject of the assessment (e.g., L.A. Bunker Fuel, USGC HSFO), and Platts price assessments were used by market participants to calculate pricing formulas in certain contracts. In formulating the daily price assessments for a given product, Platts used, among other things, a Market-on-Close ("MOC") process in which Platts reviewed orders to buy and sell ("bids" and "offers," respectively) submitted by market participants to Platts during designated daily 30- to 45-minute periods (the "Platts Window"). Platts also solicited information regarding current market conditions from market participants,

---

[1] All dates and numbers in this Statement of Facts are approximate.

which informed, among other things, where Platts set the initial starting price for trading in the Platts Window (*i.e.*, the "peg") as well as the price assessment published after the close of the Platts Window.

### L.A. Bunker Fuel

5.      From September 2012 through August 2016 ("L.A. Bunker Fuel Relevant Period") employees at Chemoil and later at Glencore, including Emilio Jose Heredia Collado ("Heredia"), Marketer-1, Marketer-2, Marketer-3, and other co-conspirators, conspired to manipulate, and did manipulate, the price of fuel oil (a commodity in interstate and international commerce) whose price was determined by reference to the Platts L.A. Bunker Fuel price assessment.

6.      At the beginning of the L.A. Bunker Fuel Relevant Period, Heredia was Vice President of Trading for the Americas at Chemoil and was responsible for, among other things, buying and selling fuel oil at the Port of Los Angeles. Heredia remained in that position through 2014, when Glencore plc acquired Chemoil. After the acquisition of Chemoil, Heredia worked at Glencore's office in San Francisco as a trader focused on buying and selling products on the West Coast of the United States, including fuel oil. During the L.A. Bunker Fuel Relevant Period, Heredia supervised certain salespeople in the San Francisco offices of Chemoil and later Glencore, including Marketer-1, Marketer-2, and Marketer-3.

7.      On numerous occasions during the L.A. Bunker Fuel Relevant Period, at Heredia's direction, employees of Chemoil and later of Glencore, including Marketer-1, Marketer-2, and Marketer-3, submitted bids and offers to Platts during the Platts Window for L.A. Bunker Fuel with the intent to cause an artificial price, that is with the intent to push the L.A. Bunker Fuel price assessment up or down artificially so that the L.A. Bunker Fuel price assessment did not reflect legitimate market-based forces of supply and demand and in order to unlawfully enrich

themselves, Chemoil, and later Glencore by increasing profits and reducing costs on Chemoil's and Glencore's contracts for physical fuel oil, including contracts with Trading Firm A[2] to buy and sell fuel oil, where the price terms of those contracts were set by reference to the L.A. Bunker Fuel benchmark price assessment.

8.      More specifically, if Glencore (or previously, Chemoil) had a contract to sell fuel oil to Trading Firm A that was priced by reference to the L.A. Bunker Fuel price assessment, it was in Glencore's (and previously, Chemoil's) interest for the L.A. Bunker Fuel price assessment to be as high as possible. Heredia directed his co-conspirators, including Marketer-1, Marketer-2, and Marketer-3, to submit bids to Platts and subsequently raise the price of those bids during the Platts Window for the express purpose of pushing up the L.A. Bunker Fuel price assessment artificially and in a manner that did not reflect legitimate market-based forces of supply and demand.

9.      Conversely, if Glencore (or previously, Chemoil) had a contract to buy fuel oil from Trading Firm A that was priced by reference to the L.A. Bunker Fuel price assessment, it was in Glencore's (or previously, Chemoil's) interest for the L.A. Bunker Fuel price assessment to be as low as possible. Heredia directed his co-conspirators, including Marketer-1, Marketer-2, and Marketer-3, to submit offers to Platts and subsequently lower the price of those offers during the Platts Window for the express purpose of pushing down the L.A. Bunker Fuel price assessment artificially and in a manner that did not reflect legitimate market-based forces of supply and demand.

10.     Glencore and Chemoil, through its salespeople including Marketer-1, Marketer-2,

---

[2] At all relevant times, Trading Firm A operated as the trading arm of National Oil Company A, a foreign state-owned petroleum company.

and Marketer-3, acting at Heredia's direction, submitted these bids and offers for L.A. Bunker Fuel to Platts during the Platts Window for the purpose of artificially affecting the L.A. Bunker Fuel price assessment, and hence artificially decreasing or increasing the price of fuel oil bought from or sold to Trading Firm A, and not for any legitimate economic reason.

11.     For example, in August 2016, Glencore had a private, bilateral contract to purchase over 45,000 metric tons of fuel oil from Trading Firm A. The price term of the contract was set by reference to the L.A. Bunker Fuel price assessment minus a fixed premium over a period of five business days between August 23, 2016 and August 29, 2016 (meaning that Glencore's exposure was over 9,100 metric tons on each of the five pricing days). On each of the five pricing days, Marketer-1, acting at Heredia's direction, submitted one or more offers to Platts and subsequently lowered the price of the offer(s) more than 40 times during the Platts Window for L.A. Bunker Fuel with the intent to push down the L.A. Bunker Fuel price assessment, and hence the price of fuel oil bought from Trading Firm A, artificially in order to reduce the cost to Glencore of purchasing fuel oil from Trading Firm A.

12.     As one example, on August 24, 2016—which was one of five pricing days— Marketer-1, acting at Heredia's direction, submitted an offer to Platts and subsequently lowered the price 41 times during the Platts Window for L.A. Bunker Fuel with the intent to push down the L.A. Bunker Fuel price assessment, and hence the price of fuel oil bought from Trading Firm A, artificially, and with the effect of moving down the price from an initial peg of $245 per metric ton to a final price assessment of $204.50 per metric ton, resulting in an unlawful gain of hundreds of thousands of dollars to Glencore from that day's manipulation alone.

13.     In addition to placing bids and offers during the Platts Window to manipulate the L.A. Bunker Fuel price assessment, salespeople at Chemoil and later Glencore, including

Marketer-1 and Marketer-2, at Heredia's direction made false and misleading statements when providing their views of the current state of the market (*i.e.*, "market color") to Platts reporters. These false and misleading statements were made to Platts with the intent of influencing the L.A. Bunker Fuel price assessment, and not for any legitimate economic purpose, since market color was one source of information that Platts considered when setting its price assessments.

14.    For example, on May 9, 2013, Heredia and Marketer-2 had the following electronic chat conversation:

| Marketer-2: | No bids today right? |
|---|---|
| Marketer-2: | just talk up? |
| Heredia: | yup…tomorrow we bid |

By instructing Marketer-2 to "talk up" the market, Heredia intended for Marketer-2 to convey false and misleading information to Platts for the purpose of presenting a distorted impression of market conditions to the Platts reporter, in preparation for bidding in the Platts Window to artificially raise the L.A. Bunker Fuel price assessment the next day. In May 2013, Chemoil had a private, bilateral contract to sell over 42,000 metric tons of fuel oil to Trading Firm A. The price term of the contract was set by reference to the L.A. Bunker Fuel price assessment minus a fixed premium over a period of three business days, May 10, 13, and 14, 2013 (meaning that Chemoil's exposure was over 14,000 metric tons on each of the three pricing days). On May 10, 2013—which was the first of the pricing days and the day as to which Heredia instructed Marketer-2 that "tomorrow we bid"— Marketer-2, acting at Heredia's direction, submitted one or more bids to Platts and subsequently raised the price of the bid(s) 25 times during the Platts Window for L.A. Bunker Fuel with the intent to raise the L.A. Bunker Fuel price assessment, and hence the price of fuel oil sold to Trading Firm A, artificially, and with the effect of moving up the price from an initial peg of $614 per

metric ton to a final price assessment of $637 per metric ton, resulting in an unlawful gain of hundreds of thousands of dollars to Chemoil from that day's manipulation alone.

15. As another example, in October 2014, Chemoil had two private, bilateral contracts to buy over 58,000 metric tons of fuel oil from Trading Firm A.[3] The price terms of the contracts were set by reference to the L.A Bunker Fuel price assessment minus a fixed premium over a period of three business days, specifically, October 27, 28, and 29, 2014 (meaning that Chemoil's exposure was over 19,300 metric tons on each of the three pricing days). On each of the three pricing days, Chemoil submitted one or more offers to Platts and subsequently lowered the price of the offer(s) more than 30 times during the Platts Window for L.A. Bunker Fuel with the intent to push down the price assessment, and hence the price of fuel oil bought from Trading Firm A, artificially and in order to reduce the cost to Chemoil of purchasing fuel oil from Trading Firm A.

16. In the morning of October 27, 2014—the first of the three pricing days—Heredia sent text messages to Marketer-1, stating, "make sure you start talking the mkt down" and "ok, we offer hard today." Approximately 40 minutes after Heredia sent the text messages, and before the Platts Window that day, Marketer-1 had the following electronic chat with Platts during which Marketer-1 was "talking the mkt down," specifically:

| | |
|---|---|
| Platts Reporter: | Any new updates on LA? |
| Marketer-1: | market selling is certainly under $500x... no demand today however indicating 490-495, most likely lower... |
| Platts Reporter: | Cool cool, thanks [Marketer-1] |

Marketer-1's statement was false and misleading because it did not reflect a genuine assessment

---

[3] By October 2014, Chemoil had been fully-acquired by Glencore plc, however, Chemoil was still listed as the counterparty to Trading Firm A in the two relevant contracts.

of supply and demand in the L.A. Bunker Fuel Market, but instead was intended to lower artificially the Platts L.A. Bunker Fuel price assessment. During the Platts Window for L.A. Bunker Fuel on October 27, 2014, Marketer-1 submitted one or more offers to Platts and subsequently lowered the price of the offer(s) 44 times during the Platts Window for L.A. Bunker Fuel with the intent to push down the L.A. Bunker Fuel price assessment, and hence the price of fuel oil bought from Trading Firm A, artificially and with the effect of moving down the price from an initial peg of $515 per metric ton to a final assessment of $471.50 per metric ton, resulting in an unlawful gain of hundreds of thousands of dollars to Chemoil from that day's manipulation alone.

17. The next day, on October 28, 2014—the second of the three pricing days—Marketer-1 again submitted one or more offers to Platts and subsequently lowered the price of the offer(s) 45 times during the Platts Window for L.A. Bunker Fuel with the intent to push down the L.A. Bunker Fuel price assessment, and hence the price of fuel oil bought from Trading Firm A, artificially and with the effect of moving down the price from an initial peg of $472 per metric ton to a final assessment of $433 per metric ton, resulting in an unlawful gain of hundreds of thousands of dollars to Chemoil from that day's manipulation alone.

18. Finally, on October 29, 2014, the last of the three pricing days, Marketer-1 had the following electronic chat with Platts in the morning before the Platts Window during which Marketer-1 continued "talking the mkt down," namely:

| Platts Reporter: | Hearing anything out of LA? |
| Marketer-1: | still super weak… minimal bunker demand and very high supply. |

Marketer-1's statement was false and misleading because it did not reflect the genuine assessment

of supply and demand in the L.A. Bunker Fuel Market, but instead was intended to cause Platts L.A. Bunker Fuel price assessment to move lower artificially. During the Platts Window for L.A. Bunker Fuel on October 29, 2014, Marketer-1 submitted one or more offers to Platts and subsequently lowered the price of the offer(s) 31 times during the Platts Window for L.A. Bunker Fuel with the intent to push down the L.A. Bunker Fuel price assessment, and hence the price of fuel oil bought from Trading Firm A, artificially and with the effect of moving down the price from an initial peg of $435 per metric ton to a final assessment of $409 per metric ton, resulting in an unlawful gain of hundreds of thousands of dollars to Chemoil from that day's manipulation alone. In addition, Marketer-1's false and misleading statement was included in the daily market commentary published by Platts at the end of the day, specifically (emphasis added):

> On the West Coast, IFO 380 CST Los Angeles fell to multiyear lows while other ports experienced slight gains. IFO 380 CST Los Angeles fell $24.50 to $409/mt ex-wharf, its lowest value since being assessed at $401/mt ex-wharf on July 21, 2009, based on activity during the MOC process. *"(LA) is still super weak,"* a West Coast trader said. *"Minimal bunker demand and very high supply."* During the MOC process, Chemoil placed an offer for 1,000 mt of IFO 380 CST to be delivered November 1-8. Beginning at the Platts peg of $435/mt ex-wharf, Chemoil gradually lowered its position before reaching $416/mt ex-wharf, where it traded with Chevron three times. Chemoil eventually lowered its position to $409/mt ex-wharf, completing another deal with Chevron without reoffer.

19.    Over the course of just these three days—October 27, 28, and 29, 2014—Chemoil (which had been fully acquired by Glencore plc by that point) unlawfully gained nearly $2.1 million from manipulating the L.A. Bunker Fuel price assessment.

20.    In total, during the entire L.A. Bunker Fuel Relevant Period, Chemoil and Glencore unlawfully gained over $85 million from manipulating the L.A. Bunker Fuel price assessment.

### *"Joint Venture" with Trading Firm A*

21.     From January 2014 through February 2016 (the "Joint Venture Relevant Period"), Heredia, on behalf of Chemoil and later Glencore, entered into an informal joint venture with Trading Firm A to help Trading Firm A blend, ship, and ultimately sell fuel oil (a commodity in interstate and international commerce) in Singapore (the "Joint Venture"). As part of the Joint Venture, Trading Firm A purchased fuel oil from National Oil Company A, with the pricing terms set by reference to the L.A. Bunker Fuel price assessment. Trading Firm A then transported the fuel oil to the Port of Los Angeles, where Chemoil and later Glencore assisted with blending the fuel oil to meet certain quality standards and specifications, and the fuel oil then was shipped to Singapore, where it was sold.

22.     During the Platts Window on certain days during the Joint Venture Relevant Period when Trading Firm A was buying fuel oil from National Oil Company A, salespeople at Chemoil and later Glencore, including Marketer-1, acting at Heredia's direction, submitted one or more offer(s) to Platts and subsequently lowered the price of those offer(s) during the Platts Window for L.A. Bunker Fuel with the intent to push down the L.A. Bunker Fuel price assessment, and hence the price of fuel oil that Trading Firm A bought from National Oil Company A in connection with the Joint Venture, artificially and in a manner that did not reflect legitimate market-based forces of supply and demand.

23.     Because Chemoil and later Glencore was pushing down the L.A. Bunker Fuel price assessment, Trading Firm A was able to buy fuel oil from National Oil Company A at artificially low prices, which increased the profit to the Joint Venture (and ultimately Chemoil and later Glencore) when the fuel oil was sold at market prices in Singapore, and resulted in unlawful gains to the Joint Venture. The Joint Venture engaged in 26 different transactions, which resulted in

ill-gotten gains of over $70 million, which Trading Firm A and Chemoil, and later Glencore, evenly divided.

### USGC HSFO

24.    From January 2011 through August 2019 ("USGC HSFO Relevant Period"), employees at Glencore and Chemoil conspired to manipulate, and did manipulate, the price of fuel oil (a commodity in interstate and international commerce) whose price was determined by reference to the daily Platts benchmark price assessment for USGC HSFO. Before Glencore plc fully acquired Chemoil in 2014, Glencore and Chemoil separately traded their own physical and derivative USGC HSFO positions.

25.    On numerous occasions during the USGC HSFO Relevant Period, employees at Glencore and Chemoil submitted bids and offers to Platts during the Platts Window for USGC HSFO with the intent to cause an artificial price, that is with the intent to push the USGC HSFO price assessment up or down artificially so that the USGC HSFO price assessment did not reflect legitimate market-based forces of supply and demand and in order to unlawfully enrich themselves, Glencore, and Chemoil by increasing profits and reducing costs on Glencore's and Chemoil's contracts for physical fuel oil, and/or increasing profits and reducing losses on Glencore's and Chemoil's derivative positions relating to USGC HSFO, where the price terms and/or value of those contracts and/or positions were set by reference to the USGC HSFO benchmark price assessment.

26.    More specifically, if Glencore or Chemoil had a contract to sell fuel oil that was priced by reference to the USGC HSFO price assessment, or had a "long" derivative position related to USGC HSFO, it was in Glencore's or Chemoil's interest for the USGC HSFO price assessment to be as high as possible. Traders and salespeople at Glencore or Chemoil submitted

bids to Platts and subsequently raised the price of those bids during the Platts Window for the express purpose of pushing up the USGC HSFO price assessment artificially and in a manner that did not reflect legitimate market-based forces of supply and demand.

27.     Conversely, if Glencore or Chemoil had a contract to buy fuel oil that was priced by reference to the USGC HSFO price assessment or had a "short" derivative position related to USGC HSFO, it was in Glencore's or Chemoil's interest for the USGC HSFO price assessment to be as low as possible. Traders and salespeople at Glencore or Chemoil submitted offers to Platts and subsequently lowered the price of those offers during the Platts Window for the express purpose of pushing down the USGC HSFO assessment artificially and in a manner that did not reflect legitimate market-based forces of supply and demand.

28.     Glencore and Chemoil, through its traders and salespeople, at times submitted these bids and offers for USGC HSFO to Platts during the Platts Window for the purpose of artificially affecting the USGC HSFO price assessment, and hence the value of Glencore's and Chemoil's physical contracts or derivative positions related to USGC HSFO, and not for any legitimate economic reason.

29.     For example, in November 2012, Glencore had physical and derivative contracts priced by reference to the USGC HSFO price assessment that consisted of a total "long" position of at least 8.7 million barrels, meaning Glencore's combined position would benefit from a rise in the USGC HSFO price assessment. Across all the trading days in November 2012, Glencore traders submitted several bids, and no offers, to Platts and subsequently raised the price of their bids over 700 times during the Platts Window for USGC HSFO with the intent to push up the USGC HSFO price assessment, and hence the value of Glencore's combined physical and derivative positions, artificially and with the effect of moving up the price, resulting in an unlawful

A-12

gain of hundreds of thousands of dollars to Glencore from the manipulation.

30.     In total, during the entire USGC HSFO Relevant Period, Chemoil and Glencore unlawfully gained over $23 million from manipulating the USGC HSFO price assessment.

31.     When engaged in the conspiracy to manipulate commodity prices described above, and as to each component of the conspiracy (relating to L.A. Bunker Fuel, the Joint Venture, and USGC HSFO), the traders and salespeople at Chemoil and Glencore were acting within the scope of their employment as employees of Chemoil and Glencore, and as agents of Chemoil and Glencore, and with the intent, at least in part, to benefit Chemoil and Glencore.

# CIRCULAR RESOLUTIONS OF THE BOARD OF DIRECTORS

## of

## GLENCORE AG
### (Glencore Ltd)

---

In accordance with Art. 713 para. 2 of the Swiss Code of Obligations, the undersigned, being all the members of the Board of Directors, and acting in their capacity as members of the Board of Directors of Glencore AG (Glencore Ltd), a company organized under the laws of Switzerland with registered office in Baar, Switzerland (the "Company"), waiving the requirement of oral deliberation, do hereby take the following actions and adopt the following resolutions by their unanimous written consent (circular resolution) in lieu of a meeting of the Board of Directors.

WHEREAS, the Company has a branch in Stamford, CT, United States (the "US Branch"), for which Cheryl Driscoll has been elected to the office of Corporate Secretary;

WHEREAS, the Company has been engaged in discussions with the United States Department of Justice, Criminal Division, Fraud Section, and the United States Attorney's Office for the District of Connecticut (collectively, the "Fraud Section and the Office") regarding issues arising in relation to certain unlawful trading activity by the Company's agents and employees;

WHEREAS, in order to resolve such discussions, it is proposed that the Company enter into a plea agreement with the Fraud Section and the Office (the "Agreement");

WHEREAS, the Board of Directors of Glencore Plc, the ultimate parent of the Company, has reviewed the Agreement and deems it in the best of the Glencore Group to enter

into the Agreement;

WHEREAS, the Glencore Group General Counsel Shaun Teichner together with outside counsel for the Company, have advised the Board of Directors of the Company of its rights, possible defenses, the Sentencing Guidelines' provisions, and the consequences of entering into such agreement with the Fraud Section and the Office; and

WHEREAS, the Board of Directors deems it is in the best interests of and of commercial benefit to the Company to enter into the Agreement to undertake and perform its obligations thereunder;

Therefore, the Board of Directors RESOLVES that:

1.     The Company (a) acknowledges the filing of an Information (as such term is described/defined in the Agreement) charging the Company with one count of conspiracy to commit commodity price manipulation, in violation of Title 18, United States Code, Section 371; (b) waives indictment on such charge and enters into the Agreement with the Fraud Section and the Office; (c) agrees to pay a criminal fine of $341,221,682 and criminal forfeiture of $144,417,203 under the Agreement with respect to the conduct described in the Information; and (d) admits the Court's jurisdiction over the Company and the subject matter of such action and consents to the judgment therein;

2.     The Company accepts the terms and conditions of this Agreement, including, but not limited to, (a) a knowing waiver of its rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); and (b) a knowing waiver for purposes of this Agreement and any charges by the United States arising out of the conduct described in the Statement of Facts attached to the Agreement of any objection with respect to venue and consents to the filing of the Information, as provided under the terms of this Agreement, in the United States District Court for the District of Connecticut; and (c) a knowing waiver of any defenses based on the statute of limitations for any prosecution relating to the conduct described in the Statement of Facts attached to the Agreement or relating to conduct known to the Fraud Section and the Office prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement;

3.	The Corporate Secretary of the US Branch, Cheryl Driscoll, is hereby authorized, empowered and directed, on behalf of the Company, to execute the Agreement substantially in such form as reviewed by the Board of Directors and attached hereto as Appendix 1 with such changes as the Glencore Group General Counsel, Shaun Teichner, may approve;

4.	The Corporate Secretary of the US Branch, Cheryl Driscoll, is hereby authorized, empowered and directed to take any and all actions as may be necessary or appropriate and to approve the forms, terms or provisions of any agreement or other documents as may be necessary or appropriate, to carry out and effectuate the purpose and intent of the foregoing resolutions;

5.	All of the actions of the Corporate Secretary of the US Branch, Cheryl Driscoll, which actions would have been authorized by the foregoing resolutions except that such actions were taken prior to the adoption of such resolutions, are hereby severally ratified, confirmed, approved, and adopted as actions on behalf of the Company; and

6.	Cheryl Driscoll, Corporate Secretary for the US Branch, is hereby elected and designated as Corporate Secretary of the Company for the purposes of this written consent and authorized, empowered and directed, on behalf of the Company, to execute the "Attachment B - Certificate of Corporate Resolutions for Glencore Ltd" as Corporate Secretary substantially in such form as attached hereto as Appendix 2 with such changes as the Glencore Group General Counsel, Shaun Teichner, may approve.

[signature page follows]

Signed by Stephan Engelbert Huber, member of the Board of Directors

Date ............................

.............................

Signed by Martin William Häring, member of the Board of Directors

Date ............................

.............................

Signed by Carlos Perezagua, Chairman of the Board of Directors

Date ............................

.............................

**Appendix 2:**

**ATTACHMENT B**

**CERTIFICATE OF CORPORATE
RESOLUTIONS FOR GLENCORE LTD.**

WHEREAS, Glencore Ltd. (the "Company") has been engaged in discussions with the United States Department of Justice, Criminal Division, Fraud Section, and the United States Attorney's Office for the District of Connecticut (collectively, the "Fraud Section and the Office") regarding issues arising in relation to certain unlawful trading activity by the Company's agents and employees; and

WHEREAS, in order to resolve such discussions, it is proposed that the Company enter into a plea agreement with the Fraud Section and the Office (the "Agreement"); and

WHEREAS, the Glencore Group General Counsel, Shaun Teichner, together with outside counsel for the Company, have advised the Board of Directors of the Company of its rights, possible defenses, the Sentencing Guidelines' provisions, and the consequences of entering into such agreement with the Fraud Section and the Office;

Therefore, the Board of Directors has RESOLVED that:

1. The Company (a) acknowledges the filing of an Information (as such term is described/defined in the Agreement) charging the Company with one count of conspiracy to commit commodity price manipulation, in violation of Title 18, United States Code, Section 371; (b) waives indictment on such charge and enters into the Agreement with the Fraud Section and the Office; (c) agrees to pay a criminal fine of $341,221,682 and criminal forfeiture of $144,417,203 under the Agreement with respect to the conduct described in the Information; and (d) admits the Court's jurisdiction over the Company and the subject matter of such action and consents to the judgment therein;

2. The Company accepts the terms and conditions of this Agreement, including, but not limited to, (a) a knowing waiver of its rights to a speedy trial pursuant to the Sixth

Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); and (b) a knowing waiver for purposes of this Agreement and any charges by the United States arising out of the conduct described in the Statement of Facts attached to the Agreement of any objection with respect to venue and consents to the filing of the Information, as provided under the terms of this Agreement, in the United States District Court for the District of Connecticut; and (c) a knowing waiver of any defenses based on the statute of limitations for any prosecution relating to the conduct described in the Statement of Facts attached to the Agreement or relating to conduct known to the Fraud Section and the Office prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement;

3.     The Corporate Secretary, Cheryl Driscoll, is hereby authorized, empowered and directed, on behalf of the Company, to execute the Agreement substantially in such form as reviewed by the Board of Directors with such changes as the Glencore Group General Counsel, Shaun Teichner, may approve;

4.     The Corporate Secretary, Cheryl Driscoll, is hereby authorized, empowered and directed to take any and all actions as may be necessary or appropriate and to approve the forms, terms or provisions of any agreement or other documents as may be necessary or appropriate, to carry out and effectuate the purpose and intent of the foregoing resolutions; and

5.     All of the actions of the Corporate Secretary, Cheryl Driscoll, which actions would have been authorized by the foregoing resolutions except that such actions were taken prior to the adoption of such resolutions, are hereby severally ratified, confirmed, approved, and adopted as actions on behalf of the Company.


Date: __5/24/2022__     By: _____
                                 Corporate Secretary
                                 Glencore Ltd.

**ATTACHMENT C**

**CORPORATE COMPLIANCE PROGRAM**

In order to address any deficiencies in its internal controls, trading surveillance protocols, compliance policies, and procedures relating to conduct in its commodities trading business in violation of (i) the Commodity Exchange Act, Title 7, United States Code, Sections 1, *et seq.*; (ii) as it applies to commodities trading, Title 18, United States Code, Section 1343; and (iii) the commodities fraud statute, Title 18, United States Code, Section 1348 (collectively (i), (ii), and (iii), the "Commodities Laws"), Glencore Ltd. (the "Company"), on behalf of itself and its direct and indirect parent companies, subsidiaries, and affiliates, agrees to continue to conduct, in a manner consistent with all of its obligations under this Agreement, appropriate reviews of its existing internal controls, surveillance protocols, compliance policies, and procedures.

Where necessary and appropriate, the Company agrees to adopt new, or to modify its existing internal controls, surveillance protocols, compliance policies, and procedures in order to ensure that it maintains an effective compliance program that is designed to effectively deter and detect violations of the Commodities Laws. At a minimum, this should include, but not be limited to, the following elements to the extent they are not already part of the Company's existing internal controls, compliance policies, and procedures:

*Commitment to Compliance*

1.      The Company will ensure that its directors and senior management provide strong, explicit, and visible support and commitment to its corporate policy against violations of the Commodities Laws and its Code of Conduct and compliance policies, and demonstrate rigorous adherence by example. The Company also will ensure that middle management, in turn, reinforce those standards and encourage employees to abide by them. The Company will create and foster a

culture of ethics and compliance with the law in its day-to-day operations at all levels of the company.

*Policies, Procedures, and Systems*

2. The Company will develop and promulgate a clearly articulated and visible corporate policy against violations of the Commodities Laws, which shall be memorialized in a written compliance policy or policies.

3. The Company will develop and promulgate compliance policies and procedures designed to reduce the prospect of violations of the Commodities Laws and the Company's Code of Conduct and compliance policies, and the Company will take appropriate measures to encourage and support the observance of ethics and compliance policies and procedures against violation of the Commodities Laws by personnel at all levels of the Company. These policies and procedures shall apply to all directors, officers, and employees, and, where necessary and appropriate, agents and intermediaries, consultants, representatives, distributors, teaming partners, contractors and suppliers, consortia, and joint venture partners (collectively, "agents and business partners"). The Company shall notify all employees that compliance with the policies and procedures is the duty of individuals at all levels of the Company.

4. The Company will maintain, or where necessary establish, effective trade surveillance protocols and systems capable of detecting trading activity that has indicia of fraudulent, manipulative, or otherwise unlawful conduct, and commit the necessary resources, including trained compliance and control personnel, to investigate and appropriately disposition any such trading that is identified.

*Periodic Risk-Based Review*

4.  The Company will develop these compliance policies and procedures on the basis of a periodic risk assessment addressing the individual circumstances of the Company.

5.  The Company shall review its compliance policies and procedures no less than annually and update them as appropriate to ensure their continued effectiveness, taking into account relevant developments in the field and evolving industry standards.

*Proper Oversight and Independence*

6.  The Company will assign responsibility to one or more senior corporate executives of the Company for the implementation and oversight of the Company's compliance policies, and procedures regarding the Commodities Laws. Such corporate official(s) shall have the authority to report directly to independent monitoring bodies, including internal audit, the Company's Board of Directors, or any appropriate committee of Glencore plc's Board of Directors, and shall have an adequate level of stature and autonomy from management as well as sufficient resources and authority to maintain such autonomy.

*Training and Guidance*

7.  The Company will implement mechanisms designed to ensure that its compliance policies, and procedures regarding the Commodities Laws are effectively communicated to all directors, officers, employees, and, where necessary and appropriate, agents and business partners. These mechanisms shall include: (a) periodic training for all directors and officers, all employees in positions of leadership or trust, all commodities traders, any positions that require such training (*e.g.*, internal audit, sales, legal, compliance, finance), and, where necessary and appropriate, agents and business partners; and (b) corresponding certifications by all such directors, officers, employees, commodities traders, agents and business partners, certifying compliance with the

training requirements. The Company will conduct training in a manner tailored to the audience's size, sophistication, or subject matter expertise and, where appropriate, will discuss prior compliance incidents.

8.      The Company will maintain, or where necessary establish, an effective system for providing guidance and advice to directors, officers, employees, commodities traders, and, where necessary and appropriate, agents and business partners, on complying with the Company's compliance policies, and procedures regarding the Commodities Laws, including when they need advice on an urgent basis.

*Internal Reporting and Investigation*

9.      The Company will maintain, or where necessary establish, an effective system for internal and, where possible, confidential reporting by, and protection of, directors, officers, employees, and, where appropriate, agents and business partners concerning violations of the Commodities Laws or the Company's compliance policies, and procedures regarding the Commodities Laws.

10.      The Company will maintain, or where necessary establish, an effective and reliable process with sufficient resources for responding to, investigating, and documenting allegations of violations of the Commodities Laws or the Company's compliance policies, and procedures regarding the Commodities Laws. The Company will handle the investigations of such complaints in an effective manner, including routing the complaints to proper personnel, conducting timely and thorough investigations, and following up with appropriate discipline where necessary.

*Enforcement and Discipline*

11.      The Company will implement mechanisms designed to effectively enforce its compliance policies, and procedures regarding the Commodities Laws, including appropriately

incentivizing compliance and disciplining violations.

12.  The Company will institute appropriate disciplinary procedures to address, among other things, violations of the Commodities Laws and the Company's compliance policies, and procedures regarding the Commodities Laws by the Company's directors, officers, and employees. Such procedures should be applied consistently, fairly, and in a manner commensurate with the violation, regardless of the position held by, or perceived importance of, the director, officer, or employee. The Company shall implement procedures to ensure that where misconduct is discovered, reasonable steps are taken to remedy the harm resulting from such misconduct, and to ensure that appropriate steps are taken to prevent further similar misconduct, including assessing the internal controls, compliance policies, and procedures regarding the Commodities Laws and making modifications necessary to ensure the overall compliance program is effective.

*Third-Party Relationships*

13.  The Company will institute appropriate risk-based due diligence and compliance requirements pertaining to the retention and oversight of all agents and business partners, including:

a.  properly documented due diligence pertaining to the hiring and appropriate and regular oversight of agents and business partners;

b.  informing agents and business partners of the Company's commitment to abiding by the Commodities Laws, and of the Company's compliance policies, and procedures regarding the Commodities Laws; and

c.  seeking a reciprocal commitment from agents and business partners.

14.  Where necessary and appropriate, the Company will include standard provisions in agreements, contracts, and renewals thereof with all agents and business partners that are

reasonably calculated to prevent violations of the Commodities Laws, which may, depending upon the circumstances, include: (a) representations and undertakings relating to compliance with the Commodities Laws; (b) rights to conduct audits of the books and records of the agent or business partner to ensure compliance with the foregoing; and (c) rights to terminate an agent or business partner as a result of any breach of the Commodities Laws, the Company's compliance policies, or procedures regarding the Commodities Laws, or the representations and undertakings related to such matters.

## Mergers and Acquisitions

15. The Company will develop and implement policies and procedures for mergers and acquisitions requiring that the Company conduct appropriate risk-based due diligence on potential new business entities, including appropriate due diligence regarding the Commodities Laws by legal, accounting, and compliance personnel.

16. The Company will ensure that the Company's compliance policies, and procedures apply as quickly as is practicable to newly acquired businesses or entities merged with the Company and will promptly (a) train the directors, officers, employees, commodities traders, agents, and business partners consistent with Paragraphs 7–8 above on the Commodities Laws and the Company's compliance policies, and procedures; and (b) where warranted, conduct an audit of all newly acquired or merged businesses as quickly as is practicable concerning compliance with the Commodities Laws.

## Monitoring, Testing, and Remediation

17. In order to ensure that its compliance program does not become stale, the Company will conduct periodic reviews and testing of its compliance policies, and procedures designed to evaluate and improve their effectiveness in preventing and detecting violations of the Commodities

Laws and the Company's compliance policies, and procedures, taking into account relevant developments in the field and evolving industry standards. The Company will ensure that compliance and control personnel have sufficient direct or indirect access to relevant sources of data to allow for timely and effective monitoring and/or testing of transactions. Based on such review and testing and its analysis of any prior misconduct, the Company will conduct a thoughtful root cause analysis and timely and appropriately remediate to address the root causes.

## ATTACHMENT D

## <u>INDEPENDENT COMPLIANCE MONITOR</u>

The duties and authority of the Independent Compliance Monitor (the "Monitor"), and the obligations of Glencore Ltd. (the "Defendant"), with respect to the Monitor and the United States Department of Justice, Criminal Division, Fraud Section and the United States Attorney's Office for the District of Connecticut (collectively, the "Fraud Section and the Office"), are as described below:

1.     The Defendant will retain the Monitor for a period of three years (the "Term of the Monitorship"), unless the early termination provision of Paragraph 7 of the Plea Agreement (the "Agreement") is triggered.

*Monitor's Mandate*

2.     The Monitor's primary responsibility is to assess and monitor the Defendant's compliance with the terms of the Agreement, including the Corporate Compliance Program in Attachment C, so as to specifically address and reduce the risk of any recurrence of the Defendant's misconduct. During the Term of the Monitorship, the Monitor will evaluate, in the manner set forth below, the effectiveness of the internal controls, trading surveillance protocols, compliance policies, and procedures as they relate to the Defendant's current and ongoing compliance with (i) the Commodity Exchange Act, Title 7, United States Code, Sections 1, *et seq.*; (ii) as it applies to commodities trading, Title 18, United States Code, Section 1343; and (iii) the commodities fraud statute, Title 18, United States Code, Section 1348 (collectively (i), (ii), and (iii), the "Commodities Laws") and take such reasonable steps as, in his or her view, may be necessary to fulfill the foregoing mandate (the "Mandate"). This Mandate shall include an assessment of the

Board of Directors' and senior management's commitment to, and effective implementation of, the corporate compliance program described in Attachment C of the Agreement.

*Defendant's Obligations*

3.      The Defendant shall cooperate fully with the Monitor, and the Monitor shall have the authority to take such reasonable steps as, in his or her view, may be necessary to be fully informed about the Defendant's compliance program in accordance with the principles set forth herein and subject to applicable law, including applicable data protection and labor laws and regulations. To that end, the Defendant shall: facilitate the Monitor's access to the Defendant's documents and resources; not limit such access, except as provided in Paragraphs 5–6; and provide guidance on applicable local law (such as relevant data protection and labor laws). The Defendant shall provide the Monitor with access to all information, documents, records, facilities, and employees, as reasonably requested by the Monitor, that fall within the scope of the Mandate of the Monitor under the Agreement. The Defendant shall use its best efforts to provide the Monitor with access to the Defendant's former employees and its third-party vendors, agents, and consultants.

4.      Any disclosure by the Defendant to the Monitor concerning potential violations of the Commodities Laws shall not relieve the Defendant of any otherwise applicable obligation to truthfully disclose such matters to the Fraud Section and the Office, pursuant to the Agreement.

*Withholding Access*

5.      The parties agree that no attorney-client relationship shall be formed between the Defendant and the Monitor. In the event that the Defendant seeks to withhold from the Monitor access to information, documents, records, facilities, or current or former employees of the Defendant that may be subject to a claim of attorney-client privilege or to the attorney work-

product doctrine, or where the Defendant reasonably believes production would otherwise be inconsistent with applicable law, the Defendant shall work cooperatively with the Monitor to resolve the matter to the satisfaction of the Monitor.

6.     If the matter cannot be resolved, at the request of the Monitor, the Defendant shall promptly provide written notice to the Monitor, the Fraud Section, and the Office. Such notice shall include a general description of the nature of the information, documents, records, facilities or current or former employees that are being withheld, as well as the legal basis for withholding access. The Fraud Section and the Office may then consider whether to make a further request for access to such information, documents, records, facilities, or employees.

*Monitor's Coordination with the*
*Defendant and Review Methodology*

7.     In carrying out the Mandate, to the extent appropriate under the circumstances, the Monitor should coordinate with Defendant's personnel, including in-house counsel, compliance personnel, and internal auditors, on an ongoing basis. The Monitor may rely on the product of the Defendant's processes, such as the results of studies, reviews, sampling and testing methodologies, audits, and analyses conducted by or on behalf of the Defendant, as well as the Defendant's internal resources (*e.g.*, legal, compliance, and internal audit), which can assist the Monitor in carrying out the Mandate through increased efficiency and Defendant-specific expertise, provided that the Monitor has confidence in the quality of those resources.

8.     The Monitor's reviews should use a risk-based approach, and thus, the Monitor is not expected to conduct a comprehensive review of all business lines, all business activities, or all markets. In carrying out the Mandate, the Monitor should consider, for instance, risks presented by: (a) the particular markets in which the Defendant trades; (b) the types of financial products and services, including the particular commodities, traded by the company; (c) the status and

strength of the Defendant's detective controls, including but not limited to, the Defendant's trade surveillance and electronic communications surveillance systems; (d) the number, type, and frequency of surveillance alerts that have been triggered by an individual trader or by multiple traders on a particular trading desk and how the Defendant has handled those alerts; (e) the sufficiency of the personnel and resources within the compliance function; (f) the Defendant's organizational structure; (g) the Defendant's corporate culture; (h) the Defendant's training programs or lack thereof; (i) the Defendant's reporting mechanisms; and (j) Defendant's employee incentives and disincentives.

9. In undertaking the reviews to carry out the Mandate, the Monitor shall formulate conclusions based on, among other things: (a) inspection of relevant documents, including the Defendant's current policies and procedures; (b) on-site observation of selected systems and procedures of the Defendant at sample sites, including trade surveillance, record-keeping, and internal audit procedures; (c) meetings with, and interviews of, relevant current and, where appropriate, former directors, officers, employees, business partners, agents, and other persons at mutually convenient times and places; and (d) analyses, studies, and testing of the Defendant's compliance program.

*Monitor's Written Work Plans*

10. To carry out the Mandate, during the Term of the Monitorship, the Monitor shall conduct an initial review and prepare an initial report, followed by at least two follow-up reviews and reports as described in Paragraphs 16–19 below. With respect to the initial report, after consultation with the Defendant, the Fraud Section, and the Office, the Monitor shall prepare the first written work plan within 60 calendar days of being retained, and the Defendant, the Fraud Section, and the Office shall provide comments within 30 calendar days after receipt of the written

work plan. With respect to each follow-up report, after consultation with the Defendant, the Fraud Section, and the Office, the Monitor shall prepare a written work plan at least 30 calendar days prior to commencing a review, and the Defendant, the Fraud Section, and the Office shall provide comments within 20 calendar days after receipt of the written work plan. Any disputes between the Defendant and the Monitor with respect to any written work plan shall be decided by the Fraud Section and the Office in their sole discretion.

11.     All written work plans shall identify with reasonable specificity the activities the Monitor plans to undertake in execution of the Mandate, including a written request for documents. The Monitor's work plan for the initial review shall include such steps as are reasonably necessary to conduct an effective initial review in accordance with the Mandate, including by developing an understanding, to the extent the Monitor deems appropriate, of the facts and circumstances surrounding any violations of the Commodities Laws that may have occurred before the date of the Agreement. In developing such understanding, the Monitor is to rely, to the extent possible, on available information and documents provided by the Defendant. It is not intended that the Monitor will conduct his or her own inquiry into the historical events that gave rise to the Agreement.

*Initial Review*

12.     The initial review shall commence no later than 120 calendar days from the date of the engagement of the Monitor (unless otherwise agreed by the Defendant, the Monitor, the Fraud Section, and the Office). The Monitor shall issue a written report within 150 calendar days of commencing the initial review, setting forth the Monitor's assessment and, if necessary, making recommendations reasonably designed to improve the effectiveness of the Defendant's program for ensuring compliance with the Commodities Laws. The Monitor should consult with the Defendant concerning his or her findings and recommendations on an ongoing basis and should

consider the Defendant's comments and input to the extent the Monitor deems appropriate. The Monitor may also choose to share a draft of his or her reports with the Defendant prior to finalizing them. The Monitor's reports need not recite or describe comprehensively the Defendant's history or compliance policies, procedures, and practices, but rather may focus on those areas with respect to which the Monitor wishes to make recommendations, if any, for improvement or which the Monitor otherwise concludes merit particular attention. The Monitor shall provide the report to the Board of Directors of Glencore plc and contemporaneously transmit copies to:

Chief – MIMF Unit, Fraud Section
Criminal Division, U.S. Department of Justice
1400 New York Avenue N.W.
Bond Building, Third Floor
Washington, D.C. 20005

and

Jonathan Francis
Assistant United States Attorney
U.S. Attorney's Office for the District of Connecticut
Connecticut Financial Center
157 Church Street, 25th Floor
New Haven, CT 06510

After consultation with the Defendant, the Monitor may extend the time period for issuance of the initial report for a brief period of time with prior written approval of the Fraud Section and the Office.

13.      Within 150 calendar days after receiving the Monitor's initial report, the Defendant shall adopt and implement all recommendations in the report, unless, within 60 calendar days of receiving the report, the Defendant notifies in writing the Monitor, the Fraud Section, and the Office of any recommendations that the Defendant considers unduly burdensome, inconsistent with applicable law or regulation, impractical, excessively expensive, or otherwise inadvisable. With respect to any such recommendation, the Defendant need not adopt that recommendation

within the 150 calendar days of receiving the report but shall propose in writing to the Monitor, the Fraud Section, and the Office an alternative policy, procedure, or system designed to achieve the same objective or purpose. As to any recommendation on which the Defendant and the Monitor do not agree, such parties shall attempt in good faith to reach an agreement within 45 calendar days after the Defendant serves the written notice.

14.     In the event the Defendant and the Monitor are unable to agree on an acceptable alternative proposal, the Defendant shall promptly consult with the Fraud Section and the Office. The Fraud Section and the Office may consider the Monitor's recommendation and the Defendant's reasons for not adopting the recommendation in determining whether the Defendant has fully complied with its obligations under the Agreement. Pending such determination, the Defendant shall not be required to implement any contested recommendation(s).

15.     With respect to any recommendation that the Monitor determines cannot reasonably be implemented within 150 calendar days after receiving the report, the Monitor may extend the time period for implementation with prior written approval of the Fraud Section and the Office.

### Follow-Up Reviews

16.     A follow-up review shall commence no later than 180 calendar days after the issuance of the initial report (unless otherwise agreed by the Defendant, the Monitor, the Fraud Section, and the Office). The Monitor shall issue a written follow-up report within 120 calendar days of commencing the follow-up review, setting forth the Monitor's assessment and, if necessary, making recommendations in the same fashion as set forth in Paragraph 12 with respect to the initial review. After consultation with the Defendant, the Monitor may extend the time period

for issuance of the follow-up report for a brief period of time with prior written approval of the Fraud Section and the Office.

17.     Within 120 calendar days after receiving the Monitor's follow-up report, the Defendant shall adopt and implement all recommendations in the report, unless, within 30 calendar days after receiving the report, the Defendant notifies in writing the Monitor, the Fraud Section, and the Office concerning any recommendations that the Defendant considers unduly burdensome, inconsistent with applicable law or regulation, impractical, excessively expensive, or otherwise inadvisable. With respect to any such recommendation, the Defendant need not adopt that recommendation within the 120 calendar days of receiving the report but shall propose in writing to the Monitor, the Fraud Section, and the Office an alternative policy, procedure, or system designed to achieve the same objective or purpose. As to any recommendation on which the Defendant and the Monitor do not agree, such parties shall attempt in good faith to reach an agreement within 30 calendar days after the Defendant serves the written notice.

18.     In the event the Defendant and the Monitor are unable to agree on an acceptable alternative proposal, the Defendant shall promptly consult with the Fraud Section and the Office. The Fraud Section and the Office may consider the Monitor's recommendation and the Defendant's reasons for not adopting the recommendation in determining whether the Defendant has fully complied with its obligations under the Agreement. Pending such determination, the Defendant shall not be required to implement any contested recommendation(s). With respect to any recommendation that the Monitor determines cannot reasonably be implemented within 120 calendar days after receiving the report, the Monitor may extend the time period for implementation with prior written approval of the Fraud Section and the Office.

19.   The Monitor shall undertake a third review not later than 150 calendar days after the issuance of the first follow-up report. The Monitor shall issue a second follow-up report within 120 calendar days of commencing the review, and recommendations shall follow the same procedures described in Paragraphs 16–18. Following the second follow-up review, the Monitor shall certify whether the Defendant's compliance program, including its policies and procedures, is reasonably designed and implemented to prevent and detect violations of the Commodities Laws. The final follow-up review and report shall be completed and delivered to the Fraud Section and the Office no later than 30 calendar days before the end of the Term.

*Monitor's Discovery of Potential or Actual Misconduct*

20.   (a)   Except as set forth below in sub-paragraphs (b), (c), and (d), should the Monitor discover during the course of his or her engagement that any director, officer, employee, agent, third-party vendor, or consultant of the Defendant may have engaged in unlawful activity in violation of the Commodities Laws ("Potential Misconduct"), the Monitor shall immediately report the Potential Misconduct to the Glencore Group General Counsel, Head of Compliance of the Glencore Group, and/or the Ethics, Compliance and Culture Committee of Glencore plc, for further action, unless the Potential Misconduct was already so disclosed. The Monitor also may report Potential Misconduct to the Fraud Section and the Office at any time, and shall report Potential Misconduct to the Fraud Section and the Office upon request.

(b)   In some instances, the Monitor should immediately report Potential Misconduct directly to the Fraud Section and the Office and not to the Defendant. The presence of any of the following factors militates in favor of reporting Potential Misconduct directly to the Fraud Section and the Office and not to the Defendant, namely, where the Potential Misconduct:

(1) poses a risk to public health or safety or the environment; (2) involves senior management of the Defendant; (3) involves obstruction of justice; or (4) otherwise poses a substantial risk of harm.

(c)     If the Monitor believes that any Potential Misconduct actually occurred or may constitute a criminal or regulatory violation ("Actual Misconduct"), the Monitor shall immediately report the Actual Misconduct to the Fraud Section and the Office. When the Monitor discovers Actual Misconduct, the Monitor shall disclose the Actual Misconduct solely to the Fraud Section and the Office, and, in such cases, disclosure of the Actual Misconduct to the Glencore Group General Counsel, the Glencore Group Head of Compliance, and/or the Ethics, Compliance and Culture Committee of Glencore plc should occur as the Fraud Section and the Office and the Monitor deem appropriate under the circumstances.

(d)     The Monitor shall address in his or her reports the appropriateness of the Defendant's response to disclosed Potential Misconduct or Actual Misconduct, whether previously disclosed to the Fraud Section and the Office or not. Further, if the Defendant or any entity or person working directly or indirectly for or on behalf of the Defendant withholds information necessary for the performance of the Monitor's responsibilities and the Monitor believes that such withholding is without just cause, the Monitor shall also immediately disclose that fact to the Fraud Section and the Office and address the Defendant's failure to disclose the necessary information in his or her reports.

(e)     Neither the Defendant nor anyone acting on its behalf shall take any action to retaliate against the Monitor for any such disclosures or for any other reason.

*Meetings During Pendency of Monitorship*

21.     The Monitor shall meet with the Fraud Section and the Office within 30 calendar days after providing each report to the Fraud Section and the Office to discuss the report, to be followed by a meeting between the Fraud Section, the Office, the Monitor, and the Defendant.

22.     At least annually, and more frequently if appropriate, representatives from the Defendant, the Fraud Section, and the Office will meet together to discuss the monitorship and any suggestions, comments, or improvements the Defendant may wish to discuss with or propose to the Fraud Section and the Office, including with respect to the scope or costs of the monitorship.

*Contemplated Confidentiality of Monitor's Reports*

23.     The reports will likely include proprietary, financial, confidential, and competitive business information. Moreover, public disclosure of the reports could discourage cooperation, or impede pending or potential government investigations and thus undermine the objectives of the monitorship. For these reasons, among others, the reports and the contents thereof are intended to remain and shall remain non-public, except as otherwise agreed to by the parties in writing, or except to the extent that the Fraud Section and the Office determine in their sole discretion that disclosure would be in furtherance of the Fraud Section's and the Office's discharge of their duties and responsibilities or is otherwise required by law.

**ATTACHMENT E**

**CERTIFICATION**

To: United States Department of Justice        United States Attorney's Office
    Criminal Division, Fraud Section            District of Connecticut
    Attn: Joseph S. Beemsterboer, Acting Chief  Attn: Vanessa Roberts Avery, U.S. Attorney

Re: Plea Agreement Disclosure Certification

The undersigned certify, pursuant to Paragraph 11 of the Plea Agreement ("Agreement") filed on May 24, 2022 in the U.S. District Court for the District of Connecticut, by and between the United States of America and Glencore Ltd. (the "Company"), that undersigned are aware of the Company's disclosure obligations under Paragraph 11 of the Agreement and that the Company has disclosed to the United States Department of Justice, Criminal Division, Fraud Section and the United States Attorney's Office for the District of Connecticut (collectively, the "Fraud Section and the Office") any and all evidence or allegations of conduct required pursuant to Paragraph 11 of the Agreement, which includes evidence or allegations of a criminal violation of U.S. federal law ("Disclosable Information"). This obligation to disclose information extends to any and all Disclosable Information that has been identified through the Company's compliance and controls program, whistleblower channel, internal audit reports, due diligence procedures, investigation process, or other processes. The undersigned further acknowledge and agree that the reporting requirement contained in Paragraph 11 and the representations contained in this certification constitute a significant and important component of the Agreement and the Fraud Section's and the Office's determination whether the Company has satisfied its obligations under the Agreement.

The undersigned hereby certify that they are respectively the Corporate Secretary and the Controller of the Company and that each has been duly authorized by the Company to sign this Certification on behalf of the Company.

This Certification shall constitute a material statement and representation by the undersigned and by, on behalf of, and for the benefit of, the Company to the executive branch of the United States for purposes of 18 U.S.C. § 1001, and such material statement and representation shall be deemed to have been made in the District of Connecticut. This Certification shall also constitute a record, document, or tangible object in connection with a matter within the jurisdiction of a department and agency of the United States for purposes of 18 U.S.C. § 1519, and such record, document, or tangible object shall be deemed to have been made in the District of Connecticut.

Date:_____       Name (Printed): _____

                                       Name (Signed): _____
                                       Corporate Secretary
                                       Glencore Ltd.

Date:_____       Name (Printed): _____

                                       Name (Signed): _____
                                       Controller
                                       Glencore Ltd.

## CERTIFICATION

To: United States Department of Justice
Criminal Division, Fraud Section
Attn: Joseph S. Beemsterboer, Acting Chief

United States Attorney's Office
District of Connecticut
Attn: Vanessa Roberts Avery, U.S. Attorney

Re: Plea Agreement Compliance Certification

The undersigned certify, pursuant to Paragraph 7 of the Plea Agreement ("Agreement") filed on May 24, 2022 in the U.S. District Court for the District of Connecticut, by and between the United States of America and Glencore Ltd. (the "Company"), that the undersigned are aware of the Company's compliance obligations under Paragraph 7 and Attachment C of the Agreement, and that, based on the undersigned's review and understanding of the Company's compliance program, the Company has implemented a compliance program that meets the requirements set forth in Attachment C to the Agreement. The undersigned certifies that such compliance program is reasonably designed to detect and prevent violations of the Commodities Laws (as defined in Attachment C to the Agreement) throughout the Company's operations.

The undersigned hereby certify that they are respectively the Chief Executive Officer ("CEO") and the Head of Compliance of Glencore Group and that each has been duly authorized by the Company to sign this Certification on behalf of the Company.

This Certification shall constitute a material statement and representation by the undersigned and by, on behalf of, and for the benefit of, the Company to the executive branch of the United States for purposes of 18 U.S.C. § 1001, and such material statement and representation shall be deemed to have been made in the District of Connecticut. This Certification shall also constitute a record, document, or tangible object in connection with a matter within the jurisdiction

of a department and agency of the United States for purposes of 18 U.S.C. § 1519, and such record, document, or tangible object shall be deemed to have been made in the District of Connecticut.

Date:_____     Name (Printed): _____

                                 Name (Signed): _____
                                 Chief Executive Officer
                                 Glencore Group

Date:_____     Name (Printed): _____

                                 Name (Signed): _____
                                 Head of Compliance
                                 Glencore Group

## ATTACHMENT G

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA

        v.

GLENCORE LTD.

        Defendant.

CRIMINAL NO. 3:22-cr-71

## CONSENT PRELIMINARY
## ORDER OF FORFEITURE/MONEY JUDGMENT

WHEREAS, on May 24, 2022, Glencore Ltd. (the "Defendant"), was charged in a one-count Information, 3:22-cr-71 (the "Information"), with conspiracy to commit commodity price manipulation, in violation of Title 18, United States Code, Section 371 ("Count One");

WHEREAS, the Information included a forfeiture allegation as to Count One, seeking forfeiture to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461, of any and all property, real or personal, that constitutes or is derived from proceeds traceable to the commission of the offense alleged in Count One of the Information, including but not limited to, a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offense;

WHEREAS, on May 24, 2022, the Defendant pleaded guilty to Count One of the Information, pursuant to an agreement (the "Plea Agreement") with the United States Department of Justice, Criminal Division, Fraud Section and the United States Attorney's Office for the District of Connecticut (collectively, the "Government"), wherein the Defendant (i) admitted that forfeiture applies with respect to Count One of the Information and agreed to forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States

Code, Section 2461, a sum of $144,917,203 in United States currency, representing the amount of proceeds traceable to the violation set forth in Count One of the Information, and (ii) agreed to transfer $144,917,203 in United States currency, plus any associated transfer fees, pursuant to payment instructions provided by the United States (with $35,000,000 of the total amount to be paid into the United States Postal Inspection Service Consumer Fraud Fund) no later than ten business days after the Defendant's sentencing hearing, in full satisfaction of the forfeiture money judgment;

WHEREAS, in the Plea Agreement the Government and the Defendant agreed that the forfeiture amount under the Plea Agreement may be offset by the amount of any disgorgement payment made by the Defendant pursuant to the May 24, 2022 order and settlement between the Company and the U.S. Commodity Futures Trading Commission ("CFTC") relating to the conduct described in the Statement of Facts attached to the Plea Agreement, and on May 24, 2022 the Defendant made a disgorgement payment in the amount of $72,458,601.50 to the CFTC. Accordingly, after applying the offset for the payment to the CFTC, the remaining forfeiture amount payable to the United States is $72,458,601.50 (the "Forfeiture Amount");

IT IS HEREBY STIPULATED AND AGREED, by and between the United States of America and the Defendant, both by and through undersigned counsel, that:

1.      As a result of the offense charged in Count One of the Information, to which the Defendant pleaded guilty, a money judgment in the amount of $144,417,203 in United States currency (the "Money Judgment") shall be entered against the Defendant.

2.      Pursuant to Rule 32.2(b)(4) of the Federal Rules of Criminal Procedure, this Consent Preliminary Order of Forfeiture/Money Judgment is final as to the Defendant, upon entry

of this Consent Preliminary Order of Forfeiture/Money Judgment, and shall be deemed part of the sentence of the Defendant, and shall be included in the judgment of conviction therewith.

3.      By no later than ten business days after the date of the Defendant's sentencing hearing, the Defendant shall transfer $72,458,601.50 in United States currency, plus any associated transfer fees, to the United States by wire transfer to the United States Marshals Service (or its designee) in full satisfaction of the Money Judgment.

4.      Upon execution of this Consent Preliminary Order Forfeiture/Money Judgment, and pursuant to Title 21, United States Code, Section 853, the United States Marshals Service (or its designee), shall be authorized to deposit (i) $37,458,601.50 of the payment it received on the Money Judgment into the Department of Justice Assets Forfeiture Fund, and (ii) $35,000,000 of the payment it received on the Money Judgement into the United States Postal Inspection Service Consumer Fraud Fund, and the United States shall have clear title to such forfeited property represented in (i) and (ii).

5.      The Court shall retain jurisdiction to enforce this Consent Preliminary Order of Forfeiture/Money Judgment, and to amend it as necessary, pursuant to Rule 32.2(e) of the Federal Rules of Criminal Procedure.

6.      The Clerk of the Court shall forward three certified copies of this Consent Preliminary Order of Forfeiture/Money Judgment to Assistant United States Attorney Jonathan Francis, U.S. Attorney's Office for the District of Connecticut, 157 Church Street, Floor 25, New Haven, CT 06510.

7.      The signature page of this Consent Preliminary Order of Forfeiture/Money Judgment may be executed in one or more counterparts, each of which will be deemed an original but all of which together will constitute one and the same instrument. A facsimile or electronic

image of the original signature of any party executing this Consent Preliminary Order of Forfeiture/Money Judgment shall be deemed an original signature and shall constitute an original as against the party whose signature appears in the facsimile or electronic image.

**AGREED:**

**FOR GLENCORE LTD.:**

Date: 5|24|2022                    By: _____
                                        Cheryl Driscoll
                                        Corporate Secretary
                                        Glencore Ltd.

Date: May 24, 2022.               By: _____
                                        Howard Shapiro
                                        Christopher Davies
                                        WILMER CUTLER PICKERING HALE
                                        AND DORR LLP

**FOR THE GOVERNMENT:**

                                        JOSEPH S. BEEMSTERBOER
                                        Acting Chief, Fraud Section
                                        Criminal Division
                                        United States Department of Justice

Date: My 24, 2022                 By: _____
                                        Avi Perry, Deputy Chief
                                        Matthew F. Sullivan, Trial Attorney
                                        John J. Liolos, Trial Attorney

                                        VANESSA ROBERTS AVERY
                                        United States Attorney
                                        District of Connecticut

Date: 5/24/22                     By: _____
                                        Jonathan N. Francis
                                        Assistant United States Attorney

G-4